**H. P. HOOD & SONS, INC.**

v.

**Frank F. REALI and Mariette A. Reali.**

**Civ. A. No. 3955.**

United States District Court,
D. Rhode Island.

Feb. 4, 1970.

George M. Vetter, Jr., Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for plaintiff.

John P. Bourcier, Providence, R. I., Louis A. Petrarca, Jr., West Warwick, R. I., for defendant, Frank F. Reali.

Israel Moses, Warwick, R. I., for defendant Mariette A. Reali.

## OPINION

### Statement of the Case

PETTINE, District Judge.

This is a complaint seeking specific performance of an option in a lease to purchase the leased property owned by the defendants.

### Findings of Fact

On April 1, 1953, an indenture of lease covering certain real estate located in Warwick, Rhode Island was entered into by and between the plaintiff as lessee and the defendants as lessors.

The lease included the following option:

"The Lessee shall have the right and option to purchase the leased premises and personal property at the expiration of the original ten year term hereof or at any time during any of the three successive five year renewal terms at a price of thirty-five thousand dollars and in the event of the exercise of such option by the Lessee the Lessors agree to convey the same by a good and sufficient warranty deed and bill of sale conveying a title free and clear of all encumbrance, providing, however, *that in the event of a declaration of war involving the United States* the aforesaid option to purchase shall terminate and the Lessee shall thereafter have a like option to purchase the leased premises and personal property at the then fair market value thereof to be determined as follows:

The Lessors shall choose one appraiser; the Lessee shall choose another; the two so chosen shall choose a third and the fair market value determined by a majority of said appraisers shall be and become the option price." (emphasis added)

On January 4, 1968, the plaintiff exercised the option to purchase the property by sending registered letters to both defendants calling on them to deliver to it an appropriate deed and bill of sale on January 26, 1968 at which time the specified purchase price of $35,000 would be paid.

On January 16, 1968 in a letter to the plaintiff, the defendants rejected the option to purchase and alleged that the "war clause" was in effect.

The defendants still own the fee and are possessed of the property and there is no dispute concerning the fulfillment of all conditions precedent to the right of the plaintiff to conveyance by the defendants subject, however, to the interpretation of the "war clause" by this court.

At the trial, evidence de bene esse of the defendants' interpretation of the declaration of "war clause" was permitted subject to the court's later determination as to its admissibility.

The primary issue is the meaning of the "war clause," so called, in the option and whether or not parol evidence of the defendant Frank F. Reali's interpretation can be considered and evaluated in this regard.

*Conclusions of Law*

The rule of law as to the admissibility of parol evidence is well established. It is a rule of substantive law which prohibits varying a written agreement by declarations and parol understanding of the parties. However, the invocation of such a rule does have the caveat of a document clearly written and divorced of ambiguity in its terms.[1]

It cannot be said that the phrase in question, "* * * that in the event of a *declaration of war involving* the United States * * *," is of such clarity as to demand an interpretation by the court from its wording alone. The plaintiff would have the court confine itself to the words, "declaration of war" contending the phrase has a clear meaning. Whereas the defendants' position stresses the words "involving the United States."

In considering these respective positions, it can hardly be denied that a time of war does exist for this country. Of course, this is a political question[2] but certainly of such obviousness and immediacy as to demand judicial notice. The astronomical government expenditures in furtherance of the American effort in Vietnam exceeding two billion dollars a month, the macabre toll of

1. Phillips v. Columbus Wholesale Grocery Company, 60 R.I. 47, 197 A. 197 and cases cited therein.

2. Velvel v. Johnson, D.C.Kan., 287 F. Supp. 846; United States v. Sisson, D.C. Mass., 294 F.Supp. 511.

young American lives, the explosion in the public forum rocking the country to its very foundation, the intimacy with the horror of human beings in mortal combat as relived on television sets, and the presence of approximately one-half million troops in Vietnam are all too real to dispute that we are indeed engaged in war; that a time of war does tragically exist.

The plaintiff seeks to negate this gruesome reality as it pertains to the contract in question by saying it is not the creature of a "declaration of war" resting on the difference between war in the factual sense as against the technical or legal sense.[3] It argues that in the phrase in question not only does the word "declaration" signify a distinct statement but so does the word "event" and neither the hostilities in Vietnam nor Public Law 88–408, 78 Stat. 384, The Tonkin Gulf Resolution [4] relied on by the defendants constitute a declaration of war. Indeed, it contends a deep concern of Congress is our presence in Vietnam without a declaration of war.

The phrase does not have so plain a meaning as to be easily susceptible of solution. War does in fact exist and it cannot be questioned that the United States is deeply "involved." To deny this would be sheer ignorance. The phrase does not read, "declaration of war by the United States" and as a consequence a distillation of all this does result in ambiguity requiring a construction giving effect to the intention of the parties and a determination whether or not the words were employed deliberately.

The defendant in this case, Frank F. Reali, testified that he wanted the war clause inserted to protect him in the event of wartime. His only concern was whether United States participation in a war would have an effect on the value of his land. He wished to be protected against inflation.

It is beyond dispute that Rhode Island recognizes specific performance

3. 93 C.J.S. War and National Defense, Section 1.

4. The text of the Resolution is as follows:

Whereas naval units of the Communist regime in Vietnam, in violation of the principles of the Charter of the United Nations and of International law, have deliberately and repeatedly attacked United States naval vessels lawfully present in international waters, and have thereby created a serious threat to international peace; and

Whereas these attacks are part of a deliberate and systematic campaign of aggression that the Communist regime in North Vietnam has been waging against its neighbors and the nations joined with them in the collective defense of their freedom; and

Whereas the United States is assisting the peoples of southeast Asia to protect their freedom and has no territorial, military or political ambitions in that area, but desires only that these peoples should be left in peace to work out their own destinies in their own way: Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the Congress approves and supports the determination of the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression.

Sec. 2. The United States regards as vital to its national interest and to world peace the maintenance of international peace and security in southeast Asia. Consonant with the Constitution of the United States and the Charter of the United Nations and in accordance with its obligations under the Southeast Asia Collective Defense Treaty, the United States is, therefore, prepared, as the President determines, to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom.

Sec. 3. This resolution shall expire when the President shall determine that the peace and security of the area is reasonably assured by international conditions created by action of the United Nations or otherwise, except that it may be terminated earlier by concurrent resolution of the Congress.

of an option to purchase contained in a lease and that consideration for the irrevocable nature of the option is supplied by the consideration given to the optionee in the lease.[5] An option would have little value if it could be lost easily.

██ In defendants' view the option to purchase the land at the price established in the contract would be revoked if the United States were "involved" in a war which was declared by any other combatant. Thus, the mere presence of United States assistance, military or otherwise, in any number of national and international incidents in recent years apparently would satisfy the "war clause," as long as defendants were able to discover a declaration of war by any party to the conflict.[6] It is unassailable that the relevant inquiry is directed to the intent of the parties at the time the contract was entered into, but it is impossible for this court to believe, in the absence of evidence to the contrary, that the plaintiff would have agreed to such an illusory option, even lacking foresight of the expansion of global commitments by the United States in the nearly seventeen years since the lease was signed. On the other hand, the parties could have used the phrase, "declaration of war *by* the United States," if they had wanted such a narrow restriction. This court finds, therefore, that the parties' intention was that the declaration itself would involve the United States, or in other words, that the clause would be satisfied whenever the United States declared war or whenever another country declared war on the United States, neither of which has been satisfied in the case at bar.

██ The Gulf of Tonkin Resolution is not equivalent to a "declaration of war" for purposes of the war clause. President Johnson's message to Congress on August 5, 1964 and the Congressional Records support this position.[7]

5. Durepo v. May, 73 R.I. 71, 54 A.2d 15, 172 A.L.R. 429; Butler v. Richardson, 74 R.I. 344, 60 A.2d 718; Humble Oil & Refining Co. v. Lennon, 94 R.I. 509, 182 A.2d 306; Shell Oil Co. v. Addessi, 1 Cir., 363 F.2d 101; see generally Corbin on Contracts, Sec. 266 at p. 539.

6. Navios Corporation v. The Ulysses II, D.C., 161 F.Supp. 932, aff'd. 260 F.2d 959—similar language was interpreted. The charter contract provided:

"If war is declared against any present NATO countries, * * * (defendants) have the right to cancel * * *"

In denying the plaintiff's claim for damages as a result of defendant's cancellation, the trial court said at p. 934:

"The clause does not permit cancellation merely because one of the NATO countries is engaged in war, or because a state of war exists between such country and another, whatever its effects. It permits cancellation only if war is declared, i. e. if there is a declaration of war against one or more of the named NATO countries; but those words should be interpreted as they would be understood by business men engaged in the shipping business in the United States, in the light of the purpose which the clause was intended to accomplish."

See also Golden Gate Corporation v. Barrington College, 98 R.I. 35, 199 A.2d 586.

7. President Johnson's message to Congress on August 5, 1964 requested only:

"* * * a resolution expressing the unity and determination of the United States in supporting freedom and in protecting peace in southeast Asia. * * * It could state in the simplest terms the resolve and support of the Congress for action to deal appropriately with attacks against our Armed Forces and to defend freedom and preserve peace in southeast Asia in accordance with the obligations of the United States under the Southeast Asia Treaty."

Reprinted in 113 Cong.Rec. 26275 (Sept. 26, 1967)

Senator Fulbright, the sponsor of the Resolution in the Senate, assured his colleagues, in the floor debate on August 6, 1964, that the text, as subsequently approved was "* * * the expression of an advisory opinion of broad policy * * *" Reprinted in 113 Cong.Rec. 26763 (Sept. 26, 1967). It is true that on August 6, 1964, Senator Morse warned that: "In my judgment, this resolution, no matter what semantics are used, spells out the ugly words, 'Undated dec-

It must be noted that whether this court holds "declaration of war" is or is not ambiguous in turn requiring the acceptance or rejection of parol evidence, the end result is the same, for Mr. Reali testified he knew the difference between a declared and an undeclared war, that he knew the difference between just "involvement" and a "declaration" and that he knew that the word "declaration" was used in this war clause at the time he signed the lease. At this point, the defendants' contentions in this trial have been effectively destroyed strengthening the plaintiff's position that "declaration of war" is as provided in Article 1, Section 8 of the United States Constitution, "The Congress shall have power * * * to declare war * * *." Conceding the involvement described supra, it is of no consequence within the meaning of this contractual provision. We simply do not reach that point. However, even if this court were to find that the parties did not use the term in its strictest constitutional sense, the compatible meaning of that phrase remains.[8]

To relieve the defendant, a reasonable businessman, of this agreement would be to place an unreasonable interpretation on the contract terms unwarranted by the evidence.

Judgment is hereby entered for the plaintiff. This court orders the defend-

ants to convey the premises as described in the lease upon payment by plaintiff of the $35,000 established as the purchase price in the option clause.

Plaintiff will prepare an appropriate order reflecting the court's opinion.

laration of war power to be vested in the President of the United States.' " Reprinted in 113 Cong.Rec. 26751 (Sept. 26, 1967)

However, Senator Morse was able to convince only Senator Gruening of this danger, and the Resolution was adopted by the Senate by a vote of 88–2. The Congressional Record of August 6 and 7, 1964 gives ample evidence that The Tonkin Resolution was not intended as a constitutional declaration of war, though this court recognizes that a contrary interpretation has been presented in 81 Harv.L.Rev. 1771, 1804 (1968). Yet one need only refer to subsequent debates and particularly to 113 Cong.Rec. 471–30 (Feb. 28, 1967) to recognize that that is still the prevailing view in Congress.

8. "Declaration of war" has been defined as follows:

a) A formal announcement by a sovereign or state of the beginning of hostilities against another.
—Webster's New International Dictionary (3d ed. 1961)

b) A formal statement by a nation through its executive or legislative department announcing that a state of war exists with another nation.
—Ballantine's Law Dictionary (3d ed. 1969)

c) A public and formal proclamation by a nation, through its executive or legislative department, that a state of war exists between itself and another nation, and forbidding all persons to aid or assist the enemy.
—Black's Law Dictionary (Rev. 4th ed. 1968)