294 A.2d 392.

JILL F. CHASE *vs.* BLACKSTONE DISTRIBUTING Co. *et al.*

AUGUST 21, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

538

KELLEHER, J. This civil action seeks a determination of the ownership of eight shares of no par value common stock. It was heard by a justice of the Superior Court. There was an extended trial. The trial justice found for the defendants and judgment was entered denying and dismissing the complaint. The plaintiff appealed.

The record before us reveals the initiation of a business which can be described as a marvel of the mass merchandising industry, the breakup of a marriage and a distressing intimate view of inter-personal relationships between members of the Chase family.

Martin and Helen Chase were the parents of three children—Irwin, Sam and Marjorie. During his life, Martin had been involved in a variety of commercial endeavors. In the early 1950's his main interest was the manufacture and sale of Christmas ribbon and greeting cards. Irwin was working with his father. Martin began the liquidation of the ribbon business.

At this time, Irwin started to sell Martin's surplus ribbons and cards to the people who were employed in the many businesses located in buildings which were the site of what was the Ann & Hope Mill. The mill complex, which was owned by the corporation in which the father had an interest, is situated in Cumberland, Rhode Island.

Irwin's ribbon and card business became so successful that he began to sell other products. The business expanded and, in time, it took over the entire basement of one of the mill buildings. This endeavor featured a minimum markup in the retail price and it is recognized in the retailing industry as one of the first of the many discount stores that are available to today's shopper. The growth experienced in Cumberland was such that the many related facets of this enterprise have taken over the entire complex.

On February 8, 1954, Irwin filed a notarized statement with the Cumberland Town Clerk which described him as the sole proprietor of Ann & Hope. Further success led to incorporation. This occurred on August 26, 1954. The corporate name was Ann & Hope Factory Outlet, Inc.

During this time, Ann & Hope made a special effort to sell goods that were fair traded at a price much lower than the stipulated minimum retail resale price. This policy caused a problem because many suppliers or distributors, in making a concerted attempt to keep their goods out of stores such as Ann & Hope,[1] would not sell to the so-called discounters. As a countermeasure, Irwin decided to form a new corporation whose sole function was to act as a purchasing agent for Ann & Hope. The corporation was called Blackstone Distributing Co. and it was formed on November 1, 1955. The articles of incorporation author-ized the issuance of 600 shares of no par value common stock. One hundred shares were issued. The organizational minutes of the corporation show that Irwin pur-

[1] In *United States Time Corp. v. Ann & Hope Factory Outlet, Inc.*, 98 R. I. 503, 205 A.2d 125 (1964), a divided court upheld the constitutionality of the Fair Trade Act. Later, in *Shulton, Inc. v. Apex, Inc.*, 103 R. I. 131, 235 A.2d 88 (1967), we rejected a contention made by Ann & Hope and another retailer that the issuance of stamps and other similar devices by merchants violated the Fair Trade Act and acted as a waiver of the enforcement rights. The Fair Trade Act was repealed in 1970.

chased 60 shares, Sam purchased 20 shares and Helen, their mother, purchased 20 shares. Irwin was elected president. Sam became vice-president. The mother assumed the office of treasurer and Irwin's attorney, who was one of the incorporators, was listed as the corporation's secretary.

By 1961, Irwin's initial venture had won widespread acceptance by the buying public. He then decided that a second Ann & Hope store would be opened in Warwick, Rhode Island. Sam was also active in the business.

All was not business, however, because in 1961 both brothers were married within a month of each other. Irwin, the older of the two, married Phyllis and Sam married Jill. Marjorie had married about two years earlier. Her husband's name was Saul. He, too, became part of the Ann & Hope's management team. Martin, the father, had also assumed an executive role. The stock certificates, which are the subject matter of this suit, describe him as the treasurer of Blackstone.

When Irwin decided to open the second store, his father had expressed the wish that its ownership be shared equally by the three children. Irwin agreed that his father's wish would become a reality. Business considerations prompted Irwin to seek the advice of an attorney whose specialty was taxes so that a plan could be evolved relative to the construction and operation of the new store which would lessen the tax impact of what promised to be an unquestionably prosperous undertaking.[2] A meet-

---

[2]*Discount Store News*, for April 22, 1968, reported that the two stores had attained an annual sales volume of $27,000,000. Several trade publications were introduced into evidence for the purpose of showing that the father was the guiding genius behind the Ann & Hope success story. Irwin testified that Martin's participation, as reported in the press, was a public relations effort to counter an advertising campaign by a competitor who had publicized his mother. Ann & Hope decided to project a father image. The trial justice believed Irwin.

ing was held in early December, 1961. In attendance were Irwin, Sam, Martin, the attorney who was the secretary of Blackstone, the accountant for the numerous Chase family enterprises and the tax specialist.

A duplicate copy of a memorandum prepared by the specialist is in evidence. The memo lists the various subjects that were discussed at the meeting. It is replete with suggestions for the formation of different corporations which would purchase such items as the site for the new facility or the store's fixtures, and lease them back to the operating company to be known as Ann & Hope of Warwick. The memo describes Ann & Hope of Warwick as being a totally-owned subsidiary of Blackstone. In its last clause, the memo specifically referred to Martin Chase's desire that the Warwick store be equally owned by his three children but then went on to describe a plan which calls for the redistribution of Blackstone stock over a period of two years so that any gift tax liability would be substantially reduced. The plan called for the mother to give portions of her stock to Marjorie, Saul and their young daughter, Stacie. Irwin was to give portions of his stock to his brother, his sister, his niece and his sister-in-law, Jill. She was to receive four shares in 1961 and an additional four shares in 1962. The memo concludes, "After the foregoing transaction [sic] have taken place, Irwin, Sam and his family, and Marjorie and her family, as units, will each own 33 1/3 shares of Blackstone and will, thereby, own the new Ann-Hope, Warwick, in equal shares." As can be seen, the tax specialist's solution was somewhat at odds with Martin's wish and with Irwin's agreement that the Warwick store should be equally owned by the three children.

The tax-saving plan of the specialist brings into focus the rapport that existed between Jill and her brother-in-law Irwin. To put it bluntly, there was none. When Irwin's

matrimonial plans were being discussed, Jill apparently let it be known that the forthcoming nuptials did not have her approval. Jill did not become part and parcel of the togetherness that was characteristic of the Chase family. Sam and Jill were frequently absent from the weekly Friday night dinners given for the family by the mother and father at their home. Other incidents occurred which caused Irwin to have doubt as to the stability of Sam's marriage and to distrust his sister-in-law. When Irwin realized the implications of the stock redistribution, he expressed serious reservations to the corporate attorney as to whether he should follow through on the tax specialist's suggestion to give the eight shares of Blackstone stock to Jill.

The attorney thought the problem would be easily resolved by having Jill give Irwin a stock power[3] which he would keep along with the stock certificates. Sam was the go-between and when he asked his wife to give Irwin the stock power, she replied that she would not accept an "Indian Gift" and emphasized in no uncertain fashion that she did not want the stock.

When Sam relayed Jill's negative reply to his brother, Irwin declared that he would do with the stock as he pleased. The corporate attorney prepared the stock certificates which were needed to implement the redistribution plan. Sometime later, the attorney delivered some 25 to 35 stock certificates to Irwin for his signature and that of his father. It was now sometime near Christmas, 1961. The new certificates were made in the names of Marjorie, or Saul, or their daughter Stacie, or Sam or Jill. The certificates were signed by Irwin as president and Martin as treasurer.

Irwin delivered the certificates to his brother, his sister and her family. He did not deliver the certificates standing

---

[3]While the exact provisions of the so-called stock power were never put forth in the record, it was obvious that any such document would give Irwin complete control over the stock listed in Jill's name.

in Jill's name to her but rather he deposited them in a locked compartment in the safe located in the money room of the Cumberland store. Only Irwin had access to this compartment.

Sam and Jill separated in April, 1968. Divorce proceedings were commenced in the Family Court. Subsequently, in August, 1969, this complaint was filed in the Superior Court.

In dismissing Jill's complaint, the trial justice gave a bench decision in which he detailed a lengthy and discursive review of the evidence. His dismissal was based on his finding that Irwin never intended to give the eight shares of stock to his sister-in-law. Although plaintiff's counsel argues with considerable and commendable vigor that the state of the record is such that we can draw our own inferences from the "substantially undisputed facts," we cannot agree with his characterization of the evidence or with the rule that when the evidence is not in dispute, an appellate court is in as good a position as a trial court to make findings of fact.

The testimony is in sharp conflict. Jill, her parents and sister told the court that both Irwin and his father had told them on several occasions that Jill owned a piece of the new store. This was denied by Irwin, his father and his brother. The plaintiff also posed the question of how could anyone such as a "well-educated" and "well-advised" businessman like Irwin be so oblivious to the consequences of signing such documents as tax returns and stock certificates. Irwin countered by describing himself during the period of consultations with the tax specialist and the execution of the stock certificates and tax returns as a hard-working, conscientious, always-on-the-go executive whose efforts to promote business so occupied his attention that he was not aware of what he was doing when the documents came across his desk for signature. Credibility did play an important part in the

trial justice's resolution of the controversy. In fact, when commenting upon Irwin's lack of donative intent, the trial justice remarked as follows:

> "However, in making the findings of fact as I intend to make them, I should like to make very clear that I have considered all of the testimony bearing upon those facts, and in so far as I may find certain facts to have been proven by a fair preponderance of the evidence, by that finding I thereby reject evidence which may have been introduced to the contrary."

We acknowledge our earlier cases where it has been said that it was this court's right and power to weigh and analyze substantially undisputed testimony unaffected by the trial justice's decision. *Lamb* v. *Feyler,* 68 R. I. 83, 26 A.2d 752 (1942); *Levy* v. *Zura,* 60 R. I. 399, 199 A. 291 (1938); *Stiness* v. *Brennan,* 51 R. I. 284, 154 A. 122 (1931). The apparent rationale of such a holding is that the appellate court is in as good a position as the trial court to draw the inferences from the undisputed testimony. *Stiness* v. *Brennan, supra.* There has been a significant departure from that principle.

Beginning with *Arden Eng'r Co.* v. *E. Turgeon Constr. Co.,* 97 R. I. 342, 348, 197 A.2d 743, 746 (1964), this court has said that since it is the job of the trial justice to draw the inferences, we will accept his inferential findings as valid and binding, as well as his determination of credibility, so long as the inferences he draws whether affirmative or negative flow logically and reasonably from the established facts even though another set of equally reasonable inferences could be drawn from the evidence. We have reiterated this rule innumerable times since then. *Hopkins* v. *Equitable Life Assurance Soc'y,* 107 R. I. 679, 270 A.2d 915 (1970); *Smith* v. *DeFusco,* 107 R. I. 392, 267 A.2d 725 (1970); *Tefft* v. *Tefft,* 105 R. I. 496, 253 A.2d 601 (1969); *Spouting Rock Beach Ass'n* v. *Garcia,* 104 R. I. 451, 244 A.2d 871 (1968); *Hagan* v. *Osteopathic General Hospital,*

102 R. I. 717, 232 A.2d 596 (1967); *Cinq-Mars* v. *Travelers Ins. Co.,* 100 R. I. 603, 218 A.2d 467 (1966).

Nor can plaintiff gain solace from *Volpe* v. *Marina Parks, Inc.,* 101 R. I. 80, 220 A.2d 525 (1966), where in reversing the trial justice, we alluded to the fact that most evidence in the case consisted of documents. This fact, standing alone, did not give us a license to second guess the trial justice. A close look at *Volpe* shows that the trial justice found as he did because of his belief that otherwise the owner of one of the lots of land in dispute would be denied access to certain tidal waters. · We reversed the trial justice because he had overlooked the significance of a recorded plat which showed beyond question that the original developer of the area had indeed furnished the very access which the trial court said did not exist. The trial justice in the instant case, however, has not misconceived the import of any of the various documents executed by Irwin Chase.

Accordingly, as we proceed to consider this appeal, we shall be guided by our well-settled rule that findings of fact made by the trial justice are entitled to great weight by the reviewing court and will not be disturbed unless they are clearly wrong.

The plaintiff, if she is to sustain her claim of a gift of stock, must demonstrate a present true donative intent on the part of the donor, Irwin, together with some manifestation such as an actual or symbolic delivery of the stock so as to completely divest himself of its dominion and control. *Wyatt* v. *Moran,* 81 R. I. 399, 103 A.2d 801 (1954); *Carr* v. *MacDonald,* 70 R. I. 65, 37 A.2d 158 (1944); *Weber* v. *Harkins,* 65 R. I. 53, 13 A.2d 380 (1940); *People Savings Bank* v. *Webb,* 21 R. I. 218, 42 A. 874 (1899).

In *Talbot* v. *Talbot,* 32 R. I. 72, 78 A. 535 (1911), the subject of the suit was an alleged inter vivos gift of stock in trust from the donor to a trustee who was someone other than the donor. The court referred to principles relating

to gifts which we have set forth in the preceding paragraph and found that a gift had been made because the donor intended to make a gift and had done "all that was necessary" to transfer ownership of the stock.

The plaintiff argues that the trial justice misconceived the true nature of the stock transfer because he overemphasized the Chases' lack of affection for Jill. She argues, and we agree, that the transfer was to effectuate a redistribution of the Blackstone stock. Jill tries to put the proposed transfer to her on the same par as the stock given to Saul and his daughter. The record, however, does not support such an equation.

It is clear from the testimony that Irwin, his parents and his brother looked upon Saul as one of the family. They spoke of his brother-in-law in glowing terms, whereas, there was a mistrust of Jill. If stock were ever transferred to Jill, Irwin intended that she would be nothing more than a straw with the active control of the stock vested in him. When Jill refused to sign the stock power, that put an end to her participation in the tax specialist's proposal. While Jill insists that she was aware of Irwin's gift to her long before her marital difficulties came to light, there is evidence to the contrary. The initial complaint filed in this case makes no claim whatever that Irwin was the donor and she the donee. There was also testimony by an attorney who represented Jill in the Family Court proceeding which could offer support to defendants' view that Jill's claim of a gift of Irwin's stock had its origin sometime long after 1961.

The plaintiff, in seeking to overturn the judgment entered below, claims that the trial justice erred in not regarding the gift tax returns and Blackstone's corporate records as a solemn declaration of Irwin's affirmative intent to benefit his sister-in-law. The first reply to this conten-

tion is that these documents were prepared in such a fashion that they did not deserve such reverential deference.

A gift tax return is not conclusive evidence that a gift has been made. *Zipp* v. *Commissioner of Internal Revenue,* 28 T. C. 314, *aff'd,* 259 F.2d 119 (6th Cir. 1958); *McSpadden* v. *Mahoney,* 431 P.2d 432 (Okla. 1967). According to the redistribution plan, Irwin was to give Jill four shares of stock in both 1961 and 1962. Helen, his mother, was scheduled to give Saul four shares in each of these same years. Nevertheless, Irwin's 1961 return does not list Jill as a donee, but lists instead Saul. The 1962 return does list Jill as a donee of four shares.

Irwin testified that he had secured legal advice as to gift tax requirements in 1958 when he first gave some stock to Sam. He neither sought nor received advice for the 1961-62 certificates. It was his impression that, when names are transferred on the stock certificate, a tax return had to be filed even though no gift was intended. He also stressed that during the time in question, he was thoroughly occupied trying to open the second store and making plans to build a third store in Massachusetts. He described his signing of the return as a mere formality and remembered nothing about them. The 1961 return is proof positive of why tax returns are not, in an action such as this, considered as conclusive evidence of what they report.

The corporate records, as far as accuracy is concerned, stand in the same category as the 1961 tax return. All the certificates which were prepared by the corporate attorney bear the signatures of Irwin as president and Martin as treasurer. Yet the corporate records give no indication whatever as to when Helen, the original treasurer, was replaced by her husband. This observation merely highlights the fact that while Blackstone was a multi-million dollar corporation, its records were handled with the same informality expected from the operator of a penny candy store

who decides to incorporate. Although some corporate records show transfers being made in 1961, they were actually made in 1962.

One fact made crystal clear by this record to the trial justice was Irwin's absolute mastery of the affairs of Blackstone. The attorney who acted as the corporation's secretary did exactly what Irwin told him. Irwin was in as full control of the corporate records as he was with the day-to-day operation of Ann & Hope. These facts place in proper perspective the true status of the two contested certificates. The corporate records do not necessarily supply proof of the requisite donative intent that Jill had to establish. Rather, since Irwin had complete charge of the corporation and its records, he could have directed that a certificate be prepared without actually intending to consummate the gift.

While Jill would have us think otherwise, we are not dealing with a corporation such as the American Telephone & Telegraph Company where once a transfer has been made on the corporate books, the donor has taken what could be considered as an irrevocable step to effectuate the transfer. In such circumstances corporate records are beyond the donor's control. Here, Irwin was free to do what he did. *See Dahlke* v. *Dahlke,* 25 Wis.2d 559, 131 N.W.2d 362 (1964).

In conclusion, it should be pointed out that this case is unique in that in most instances where a dispute exists as to whether a gift has been made, the donor is deceased. Irwin, of course, is very much alive and made it quite clear to the trial justice that at no time did he ever intend to give his sister-in-law the benefit of the eight shares of stock.

The plaintiff's appeal is denied and dismissed.

Motion to reargue denied.

*Arcaro, Belilove & Kolodney, Abraham Belilove,* for plaintiff.

*Abedon & Abedon, Herbert J. Abedon, Letts & Quinn, Daniel J. Murray, Jerome B. Spunt,* for defendants.