**PEARL BREWING COMPANY**

v.

**John J. McNABOE et al.**

**83–593–Appeal.**

Supreme Court of Rhode Island.

July 3, 1985.

Howard E. Walker (Hinckley & Allen), Providence, for plaintiff.

James T. Murphy (Hanson Curran & Parks), Providence, for defendants.

## OPINION

KELLEHER, Justice.

This case is before us on the plaintiff's appeal from a judgment entered in the Superior Court ordering the plaintiff to convey to the defendants certain real estate located in North Kingstown, Rhode Island.

On September 29, 1982, plaintiff Pearl Brewing Company (Pearl) commenced this civil action against defendants John J. and Edna Mae McNaboe (McNaboes) by filing an action for trespass and ejectment in the Fourth Division District Court. Pearl alleged in the complaint that the McNaboes, as tenants at sufferance, were in possession of lands and tenements of Pearl. Pearl further alleged that the McNaboes, although receiving notice from Pearl to leave the property, had refused to quit the premises. Pearl requested judgment for possession as well as damages, the record indicating that judgment was entered in favor of Pearl on December 8, 1982. The McNaboes filed an immediate appeal to the Superior Court.

The pertinent facts are as follows. In the spring of 1979, Paul Kalmanovitz (Kalmanovitz), who was chairman of the board of Falstaff Brewing Corp. (Falstaff) and also the owner of Pearl, hired John J. McNaboe as vice president and general manager of Narragansett Brewing Company (Narragansett), located in Cranston, Rhode Island.[1] Jack Miller (Miller), then vice chairman of Falstaff and president of Pearl, died before trial. Prior to his employment with Narragansett, McNaboe lived with his wife and five children in Syracuse, New York. For ten or eleven months after assuming his duties at Narragansett, McNaboe inhabited a Warwick,

Rhode Island, apartment that was leased by the corporation. During this interim, he journeyed back and forth between Rhode Island and Syracuse to visit his family.

Later, in 1980, at a distributor's meeting in Providence, Kalmanovitz congratulated McNaboe for his performance at Narragansett and promoted him to the position of executive vice president of Falstaff. Kalmanovitz also expressed to McNaboe his desire that he move his family to Rhode Island immediately, instructing him, according to McNaboe, to "pick out a house that was either on the market or build a house." As a result of this discussion, McNaboe and his wife found and subsequently purchased an unimproved tract of land in North Kingstown, Rhode Island. They paid $10,000 to a realty company as a partial down payment, and Pearl provided the remaining $15,000 to complete the $25,000 deposit. Accompanying the $15,000 payment to McNaboe was a copy of a note from Miller to the company comptroller regarding this transaction. It read:

"Attached you will find from John McNaboe a photostatic copy of a check for $10,000, along with a note that he will need an additional $15,000, for a total of $25,000. For your information, John is building a house and the company is financing it. This should be set up as a loan and held in the suspense account. Would you please send the funds directly to John."

Handwritten on the memorandum is an addendum: "5 percent on $180,000 as per Mr. Paul." Kalmanovitz was often referred to as Mr. Paul.

McNaboe testified at the Superior Court trial that his agreement with Kalmanovitz regarding the financing for the house was originally that the company would lend him $180,000[2] at 5 percent interest, and that

---

1. Although the record is less than clear, Falstaff and/or Pearl apparently acquired Narragansett prior to Kalmanovitz's hiring of McNaboe. It is equally difficult to discern the precise relationship between Pearl and Falstaff from a reading of the record itself, although Kalmanovitz, in his deposition, testified that Pearl held 33 percent of Falstaff's stock.

2. In regard to the amount of money Pearl initially agreed to lend McNaboe, the record is less than clear. McNaboe initially testified that Kal-

pursuant to that agreement and subsequent discussions with Miller, he began paying Pearl $1,000 per month, which included interest and amortization. McNaboe further testified that no other limitations or conditions were placed on the financing at this time.

The title closing on the house took place in the spring of 1980. Notwithstanding the purchase-and-sale agreement entered into between the seller and McNaboe, the seller delivered to David Schechter (Schechter), an attorney for Pearl, a deed conveying the property to Pearl. Pursuant to the parties' earlier oral agreement, Pearl paid the remaining purchase price directly to the seller, and the McNaboes took possession of the house. At this juncture, all concerned were content with the arrangements. This tranquil state of affairs was soon to pass.

McNaboe subsequently met with Schechter to have him prepare some papers with respect to the North Kingstown property. This first set of documents, apparently including a warranty deed from Pearl as grantor to the McNaboes as tenants by the entirety and a mortgage deed and note from the McNaboes to Pearl, was submitted to Miller and Kalmanovitz. The note was for the principal amount of $174,-000, payable in monthly installments over twenty years, beginning December 3, 1980, at interest of 5 percent. In response to the receipt of these documents, McNaboe received from Miller a memorandum, dated January 8, 1981, outlining Miller and Kalmanovitz's problems with the mortgage note.

Thereafter, Attorney Schechter prepared a new set of documents. The revised mortgage note incorporated two crucial provisions that Miller had requested. First, the note recited the qualification that if McNaboe's employment with Falstaff were terminated, either voluntarily or involuntarily, he would then, within six months from the date of termination, either pay off the note or convert it to a demand note with interest at 1½ percent over the prime rate. Second, the McNaboes agreed to market the sale of their New York property aggressively and to pay the net proceeds of the sale to Pearl to decrease the indebtedness on the note. This package of documents was once again mailed to Miller.

McNaboe testified, in response to queries by the trial justice, that although he intended the revised mortgage note to be the parties' final agreement, it was "never accepted" by Miller or Kalmanovitz. He further testified that, following submission of these amended papers, the company officers continued to object to the terms within the documents. For instance, Pearl voiced objections about the amount of the principal, and it also wanted McNaboe to discount his Syracuse home so the proceeds of the sale could be applied to the principal. In addition to presenting McNaboe's testimony, the defendants' attorney also read into the record a portion of Kalmanovitz's deposition. In this deposition, Kalmanovitz initially denied the existence of any mortgage and claimed that the money lent to McNaboe was a construction loan. Later on, however, the following excerpt from Kalmanovitz's deposition was read into the record:

"Question: Is it your understanding that that was the agreement between Pearl and Mr. McNaboe [referring to the revised mortgage note]?

"Answer: That mortgage note which you're referring to is the whole story of our discussion and finalities of discussion and substance of it, from A to Z."

Kalmanovitz's deposition also revealed that the second set of documents was never signed but rather was placed in a sealed envelope in Kalmanovitz's briefcase. He carried the briefcase around, and the en-

manovitz agreed to a loan of $180,000, but subsequently, in response to a query from the trial justice, McNaboe informed the court that this figure was $174,000. Apparently aware of this contradiction, the trial justice, in a bench deci-

sion, found as a fact that the parties agreed that McNaboe would receive "somewhere between $170,000 to $180,000 at a rate of interest of five percent per year."

velope was not unsealed until after McNaboe's employment was terminated.

At closing argument, Pearl's lawyer acknowledged that the parties' agreement was in fact a mortgage, not a lease, based on Kalmanovitz's admission that the second mortgage note represented the parties' agreement. Reasoning that only equitable issues were involved in the case, the trial justice dismissed the jury. Thereafter, he found as a matter of fact that the McNaboes were the owners of the property; that there was an agreement by Pearl to lend McNaboe between $170,000 and $180,000 at 5 percent interest; that Pearl thereafter sought to amend that agreement; that the parties never reached an agreement concerning the amount of interest to be paid; that the new documents, including the new mortgage note, were not effective because they were never accepted by Pearl; and that the original intent of the parties encompassed a twenty-year mortgage at 5 percent interest.

The court ruled that the parties' agreement was taken out of the statute of frauds by part performance and reliance on the part of the McNaboes. After concluding that a constructive trust should be imposed, a determination Pearl has not attacked in this appeal, the trial justice ordered Pearl to give McNaboe and his wife a warranty deed to the property in exchange for a mortgage deed and note. The note would be for a twenty-year term, beginning as of the date of the original loan, with interest at 5 percent, and with the principal to be calculated on the basis of "rent" payments McNaboe made through the time of trial. The court thereafter entered judgment on the decision.

■ On appeal, Pearl contends that the trial justice committed reversible error in ordering the conveyance from Pearl to McNaboe subject to an unconditional twenty-year mortgage. Pearl insists that the court should instead have ordered that the conveyance be subject to the new mortgage note "the parties themselves had agreed upon." Pearl thus requests this court to amend the judgment below in accordance with the terms of the new mortgage note. Before undertaking our analysis, however, we observe that this court will give great weight to the factual findings of a trial justice sitting without a jury unless it has been found that such factual findings are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue. *Fournier v. Fournier*, —— R.I. ——, 479 A.2d 708 (1984); *Casala v. Kimberly's Crystal Liquor, Inc.*, —— R.I. ——, 461 A.2d 1365 (1983).

■ In support of its position, Pearl contends that the record does not support the trial justice's finding that the parties had originally agreed to a twenty-year mortgage at 5 percent interest. Although it is true that McNaboe never testified that Kalmanovitz promised him an unconditional twenty-year mortgage, additional evidence exists that supports such a finding. Regarding the 5 percent rate of interest, we need only look to McNaboe's exhibit C, entered as a full exhibit, and described *supra* as a note from Miller to the company comptroller regarding the parties' transaction. Handwritten on this memorandum is an addendum: "5 percent on $180,000 as per Mr. Paul." The trial justice also ordered the mortgage note and mortgage deed to recite a term of twenty years, inferring that this was the parties' original intent since this figure appeared in both mortgage notes. This finding is not clearly erroneous. Evidence of this intent can be found from the fact that both promissory notes that were prepared by Pearl's counsel called for a twenty-year term. We conclude that, contrary to Pearl's protestations, the record does support the trial justice's finding that the parties had agreed to a 5 percent, twenty-year mortgage.

■ We also believe that the trial justice was correct in finding that the McNaboes' part performance and reliance on Pearl's promise to finance their new home was sufficient to take this agreement out of the statute of frauds, G.L. 1956 (1969 Reenactment) § 9-1-4. Pursuant to his conver-

sation with Kalmanovitz at the distributor's meeting in Providence, McNaboe built a home in North Kingstown and brought his family from Syracuse to reside therein. It is undisputed that the McNaboes paid $10,000 as a partial down payment and that they later paid Pearl an additional $25,000 to reduce the principal on the loan. The McNaboes additionally made improvements on the property. Taking possession of property pursuant to an oral contract, together with making improvements or paying a substantial part of the purchase price, is generally sufficient to avoid the bar of the statute of frauds. *R.W.P. Concessions, Inc. v. Rhode Island Zoological Society,* — R.I. —, —, 487 A.2d 129, 131 (1985); *Star Dinette & Appliance Co. v. Savran,* 104 R.I. 665, 666, 248 A.2d 69, 70 (1968); 2 Corbin, *Contracts* §§ 433 and 434 at 484–98 (1950). Since we conclude that the agreement was enforceable under the doctrine of part performance, we see no need to consider Pearl's argument, premised on Kalmanovitz's judicial admission of the terms and existence of the new mortgage note, that the case was removed from the statute of frauds but only to the extent of the admission.

We arrive finally at what we consider the critical inquiry in this case—whether the parties effectively modified the terms of the original agreement. Relying on a finding that Pearl had not accepted the new mortgage note, the trial justice concluded that it was not binding on the parties.

■ Pearl insists that the novel terms within the revised mortgage note, that is, the employment and the aggressively market provisos, were proposed by Miller on behalf of Pearl and subsequently accepted by McNaboe. To support its argument that McNaboe accepted the proposed terms, Pearl notes that McNaboe incorporated the proposed terms within the new set of documents that he signed and delivered to Pearl. Thus, the argument concludes, it was unnecessary for Pearl to "accept" the new documents since the parties were bound at the point McNaboe accepted them. We find this particular stylization of the parties' transaction to be entirely reasonable. Unfortunately for Pearl, however, there were equally reasonable stylizations brewing in the evidentiary vat presented to the trial justice. This court has on innumerable occasions stressed that since it is the job of a trial justice to draw the inferences, we will accept a trial justice's inferential factual findings as valid and binding as long as the inferences drawn are logical and reasonably flow from the established facts, even though another set of equally reasonable inferences could be drawn from the evidence. *Tanzi v. Fiberglass Swimming Pools, Inc.,* — R.I. —, 414 A.2d 484 (1980); *Robidoux v. Pelletier,* 120 R.I. 425, 391 A.2d 1150 (1978); *Chase v. Blackstone Distributing Co.,* 110 R.I. 537, 294 A.2d 392 (1972).

■ Essentially, the trial justice viewed McNaboe as offeror and Pearl as offeree. According to his analysis, McNaboe offered the new agreement by submitting the revised documents to Pearl. The fact that Kalmanovitz did not sign the second warranty deed and, in fact, as revealed in his deposition, never opened the envelope containing those documents until McNaboe's employment was terminated, amply supports the court's determination that Pearl did not accept McNaboe's remodeled offer. Furthermore, Pearl's actions in filing a trespass and ejectment suit and then disputing the existence of any mortgage until closing arguments also buttress the trial justice's analysis. On the basis of this record, where the adduced evidence is such that more than one interpretation of the events leading to the proposed modification of the agreement is possible, we hold that the trial justice was not clearly wrong in concluding that the parties failed in their efforts to modify the terms of the original agreement.

Pearl's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court for further proceedings.