DECISION
Before the Court for decision is Plaintiff's suit seeking specific performance of an agreement reached for the purchase of Defendants' real estate located in Glocester, Rhode Island. For the reasons set forth herein, judgment is rendered in Plaintiff's favor. Jurisdiction is pursuant to G.L. 1956 § 8-2-13.
 Facts and Travel
This is a story of changed minds and broken promises of the worst kind — between parents and children. This Court has been thrust into a maelstrom of competing claims about what was said or done between parents, David M. King and Carol M. King ("David," "Carol," or, collectively, "Defendants"), and one of their children, Gary A. King ("Gary" or "Plaintiff"), regarding an agreement for Plaintiff to purchase the family farm.[1]
While the Court is duty bound to resolve this matter, it does so reluctantly knowing that whatever is decided may only result in greater animosity and resentment within this family. Notwithstanding numerous pre-trial efforts to forge an acceptable resolution in this matter, the Court's hand has been forced to decide this unfortunate family feud.
Based on testimony and evidence adduced at a bench trial beginning October 22, 2005, the Court makes the following findings of fact. Defendants, David M. King and Carol M. King, purchased the Property in 1970 or 1971 and the family made their home in the farm house. Plaintiff Gary King, one of three King children, was aged ten when the family moved to their new residence. During the 1980's, Defendants carved out lots from the land for each of their children and deeded a lot to their daughter and one to another son. At that time, Plaintiff declined a gift of a similar lot, saying instead that he would some day purchase the whole of the remaining Property. As an adult, Plaintiff lived and worked elsewhere but in 1989 returned to live in a garage apartment on the property and work with his father at a family business operated out of that garage. A "for sale" sign then remained on the Property and prompted discussions between Gary and David regarding Gary's purchase of the Property; David then removed the sign.
The disputed fruits of those discussions, which continued for several years, are the dispositive issue in this case. In 1989 or 1990, David and Gary reached an oral agreement that Gary would take over the mortgage on the Property outstanding with the Pawtucket Credit Union (PCU), pay the taxes and insurance thereon, and pay an additional sum to Defendants, at which time they would deed the Property to Plaintiff. It is not clear if Carol was aware of this agreement at the time, but she admitted at trial that, in 1992, she and her husband had reached such an agreement with Gary. By 1992, Defendants no longer lived on the Property, keeping a winter home in Florida and bringing a recreational vehicle to Rhode Island for part of the year, when they stayed at their daughter's home adjacent to the Property. Plaintiff was then in sole possession of the Property, having moved from the garage to the house, and operating the business.
Despite some murkiness as to specific dates, the parties are in substantial agreement with the above facts. A point of contention, however, is the amount of the final payment Gary was to make to complete the purchase. Plaintiff asserts that an understanding was reached that the figure would be $200,000, whereas David testified that $200,000 was an amount Gary stated he could afford, but which Defendants found unacceptably low. It is relevant to note that the parties understood that Gary was not at that time in a financial position to close the deal by paying the cumulative sum, but would rather continue his residence — maintaining the Property and servicing the mortgage, taxes, and insurance — until he could close at a later date.
Beginning in 1996, Plaintiff has been making mortgage payments due on the Property. Carol prepared a "Leasing Agreement" dated September 1, 1997, the body of which is set out in the margin, representing the first writing to memorialize the parties' agreement (Plaintiff's Exhibit 3, hereinafter referred to as "1997 memorandum").[2] The memorandum bears the signatures of Plaintiff, his wife, and Defendants. Despite its title, the memorandum clearly contemplates Gary's obligations "as a down payment towards purchase of home." Id. It does not state a purchase price for the Property, nor does it give a closing date. The PCU mortgage remained in Defendants' name after Plaintiff commenced making payments, and remains in Defendants name today. Defendants allege that late fees were assessed after Plaintiff took over the mortgage payments, while Plaintiff testified that payments were already behind when he received the account book. Defendants also claim that on a number of occasions after the agreement, they made past due tax and insurance payments on Plaintiff's behalf, as well as a large payment of over $4,000 to PCU when informed the mortgage was in default in July of 1998. During Carol's testimony, a notebook was presented into evidence that she claims to have kept as a contemporaneous listing of these payments. Some of the dated entries were out-of-sequence, however, and the surrounding testimony appeared contrived and was not persuasive to this Court. The Court does accept Plaintiff's testimony that he gave money to Carol to cover some bills paid by Defendants. Although the evidence presented to the Court leaves wanting a full accounting of all monies paid and received by the parties, Defendants testified that Plaintiff kept up his end of the bargain. More importantly, Defendants testified at trial that, during the 1990s, at no time did they inform Plaintiff the agreement was void due to delinquencies in Plaintiff's payment obligations. In fact, the parties agree that Defendants, at least yearly, would reiterate their agreement and desire that Plaintiff close the purchase.
Since taking sole possession of the Property, Plaintiff has expended a great deal of resources and labor on the maintenance and improvement of the Property. Plaintiff performed and/or paid for ordinary maintenance and repairs on the land and structures, such as seven acres of grass-cutting, plumbing work, electrical work, boiler repairs, and chimney maintenance. When present on the Property, David sometimes assisted his son in such tasks. Plaintiff also has made more substantial improvements to the Property: extensive repairs were done on an eroding stone wall; for over two-and-one-half months, Plaintiff undertook the large project of bringing a pond on the Property into compliance with Department of Environmental Management requirements; and he spent one summer bulldozing exposed boulders. Plaintiff credibly testified to additional work on the driveway, building foundation, lighting, landscaping, and insulation. During those years, Plaintiff knew of and considered opportunities to purchase other real estate, but chose to continue on the Property in reliance on his agreement with Defendants.
By 2003, the agreement appeared close to an amicable conclusion. David testified that in mid-2003, Plaintiff stated that he had acquired the necessary funding and expressed his readiness and desire to proceed with closing. A figure of $300,000 was agreed to as the new sum to be paid by Plaintiff — which Gary characterizes as a modification of the previous $200,000 figure, and Defendants characterize as the first firm agreement as to price. Whether a modification or initial agreement, the testimony and other evidence in the case make clear that in August of 2003, an agreement was reached that Plaintiff would pay $300,000 and the balance of the PCU mortgage to purchase the Property from Defendants. David told Gary to have a title search performed and a Purchase and Sale Agreement ("PSA") drawn up embodying the purchase for $374,000 — $300,000 plus the $74,000 balance then remaining on the PCU mortgage. David testified that he discussed this agreement with Carol, and that she agreed to it; Carol also testified to reaching this agreement with Plaintiff in 2003.
Shortly after the discussion in which David asked that a PSA be prepared, he approached Gary with the idea that Defendants retain some of the Property to provide for Defendants' grandchildren, the children of Gary's siblings. Defendants admit that, prior to August 2003, they had never discussed this additional carve-out with Plaintiff, and that Plaintiff's expectation was to receive the whole of the Property. There is also no dispute that Plaintiff was immediately hostile to the idea, saying that he would instead pack up and move away. David then relented and stated that the deal as agreed to earlier in the month would be honored. Shortly thereafter, David received the PSA from Gary and took it to be reviewed by an attorney. David's testimony is that he was advised by his attorney not to sign the PSA, which neither Defendant has done. While driving to their Florida home, Defendants left a message for Plaintiff that the deal was off. Defendants' trial testimony indicates that they felt the sale was unwise and inadequately provided for their grandchildren, so they "changed their mind."
 Standard of Review
In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." The factual determinations and credibility assessments of a trial justice "traditionally accords a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of theDissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006). Although the trial justice is required to make specific findings of fact, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. Rule 52(a).
 Law and Analysis A. Statute of Frauds
The statute of frauds requires that a contract for the sale of real estate be embodied in a signed writing. G.L. 1956 § 9-1-4(1). Although "the formal precision usually found in a written contract" is not required, a note or memorandum that sets out the sale agreement must contain certain essential terms to comply with the statute of frauds: the identity of buyer and seller, their respective intentions, a description of the land adequate to allow its identification, the purchase price, the method of payment if other than cash, and the signature of the party to be charged. Greensleeves v. Smiley,694 A.2d 714, 716 (R.I. 1997) (per curiam) (quoting Sholovitz v. Noorigian,42 R.I. 282, 285, 107 A. 94, 95 (1919)).
Here, two writings discuss the parties' agreement — the 1997 memorandum created by Carol and the 2003 PSA drawn by Gary's attorney. Clearly, neither is a writing sufficient to satisfy the statute of frauds. The 1997 memorandum, though signed by Defendants, lacks the essential element of price. The PSA, though providing all essential terms, was not signed by Defendants. Thus, without an effective writing, Defendants argue that the statute of frauds bars enforcement of their agreement with Plaintiff and requires judgment in their favor. The requirement of a signed writing is not absolute, however, and two exceptions recognized in Rhode Island and raised by the facts of this case can also satisfy the statute of frauds: where the party to be charged admits to the essential terms of the agreement in court testimony and where the party seeking enforcement demonstrates sufficient part performance in reliance on the agreement.
 B. Judicial Admission to Terms of an Agreement
A writing lacking an essential term can nonetheless satisfy the statute of frauds if the party to be charged admits to an agreement with respect to the missing term or terms. UXB Sand Gravel, Inc. v.Rosenfeld Concrete Corp., 641 A.2d 75, 80 (R.I. 1994). A memorandum or correspondence between the parties used to demonstrate their agreement must manifest an objective intent to be bound; without such intent, it is no more than part of the negotiation process and not enforceable.Id. at 79. However, even "the absence of any writing at all does not render a contract per se unenforceable if `the party to be charged admits all of the terms essential to the validity of [a] contract.'"Id. (quoting Adams-Riker, Inc. v. Nightingale, 119 R.I. 862, 867,383 A.2d 1042, 1045 (1978)).
In support of their statute of frauds defense, Defendants argue that Plaintiff's claim is defeated by a number of the circumstances surrounding their dealings. Defendants argue that the fact that Gary's purchase was first discussed in 1989, and a PSA that set a closing date first drafted fourteen years later, indicates no firm agreement was reached. Furthermore, Defendants argue that the lack of a closing date in the 1997 Leasing Agreement renders it ineffective as a demonstration of an intent to be bound. A closing date is not an element which, if absent, renders a contract outside the statute of frauds. "In the absence of stipulation, it is ordinarily held that a contract for the sale of land is to be performed within a reasonable time." Durepo v.May, 73 R.I. 71, 75, 54 A.2d 15, 18 (1947). Reasonableness is a question to be determined based upon the facts of each case. Id.
The Court finds that although fourteen years is a long duration between the commencement and closing of a real estate purchase, the circumstances of this case indicate that a reasonable and agreeable arrangement existed between Plaintiff and Defendants. In 1989, Plaintiff was residing on the Property and making substantial contributions to maintaining and increasing its value, as well as to the family business. Defendants understood that Plaintiff at that time could not make the substantial additional payment to finalize his purchase and receive the deed. This understanding continued and was memorialized in the 1997 memorandum, signed by Defendants and stating Plaintiff's obligation on the PCU mortgage payments. This obligation would be "down payment towards purchase," and was to continue until Plaintiff and his wife could obtain a mortgage. Defendants clearly benefited by such an arrangement as it relieved them of the obligation to pay over $1,700 each month to PCU. Therefore, the Court finds that under the circumstances, the fourteen-year period during which no closing was set does not negate an intent to be bound. In any event, Defendants testified that they continued to remind Plaintiff of the agreement on a regular basis and never stated to Plaintiff that they were withdrawing from the agreement because Plaintiff was taking too long. Most importantly, Defendants admit to reaching an agreement with Plaintiff in 2003 that included the ultimate purchase price. Thus, an intent to be bound is demonstrated by the 1997 memorandum and Defendants' admissions.
Defendants further argue that a lack of agreement as to purchase price renders the agreement unenforceable. If it stood alone, the 1997 memorandum would be fatally defective for lacking the essential term of purchase price. However, the Defendants — both David and Carol — testified that in August 2003, they had an agreement with Plaintiff for him to purchase the Property for $300,000, in addition to assuming the balance of the PCU mortgage. This is a testimonial admission of an essential term sufficient to supplement the 1997 memorandum and bring it into compliance with the statute of frauds. Furthermore, the oral agreement reached between David and Gary in 2003 is enforceable in the absence of any signed writing. The testimony and submissions of the Defendants to the Court demonstrate that an understanding was reached as to all the essential elements of a land sale contract. Given the undisputed course of dealings — including the 1997 memorandum — recounted in Defendants' testimony, the Court finds that the essential elements of buyer and sellers' identity, the respective intent of each, and the property at issue cannot be legitimately questioned. As stated, Defendants admitted that $300,000 was agreed to as the price, and David further testified that he agreed payment was to be either by cash or a mortgage at four percent interest.[3]
Defendants also characterize their efforts to retain some land for their grandchildren as a condition they set on the sale to Plaintiff. They further argue that, although David relented on this additional carve-out when Plaintiff refused to go along with it, Carol never agreed to relent and that there was therefore no agreement between all the necessary parties as to what land would be sold. This line of argument conflicts with Defendants' trial testimony. David stated that he discussed the $300,000 figure with Carol, and both agreed to it. Carol herself admitted that an agreement was reached in 2003 for $300,000 and assumption of the PCU obligation. She also testified that the idea of an additional carve-out "never came up" during the years Gary was occupying the Property and paying bills and taxes, and that Plaintiff's expectation was thus that he was purchasing the whole of the Property. Both Defendants characterized this additional carve-out as a "change of mind" resulting from a desire that their grandchildren get some land, which was not discussed until after the purchase price had been agreed to. Given this sequence and Defendants' admission of a change of mind, the Court finds that the issue of a carve-out was not a condition to the sale, rejection of which would bar contract formation. Rather, there was an attempt to modify the agreement, which Plaintiff immediately rejected and David abandoned, leaving the terms as agreed to by all parties — including the essential term of what land was to be sold — intact.
For the foregoing reasons, the Court finds that based on the testimonial admissions of Defendants as to all the terms essential to an agreement for the sale of land, Defendants and Plaintiff reached an enforceable oral agreement in 2003 for the sale of the Property for a purchase price of $374,000 — representing a $300,000 purchase price and Plaintiff's assumption of the $74,000 balance of the PCU mortgage.
 C. Part Performance
The doctrine of part performance allows enforcement of an oral agreement for the sale of land, despite the statute of frauds, where repudiation would lead to an unjust result. R.W.P. Concessions, Inc. v.Rhode Island Zoological Society, 487 A.2d 129, 131 (R.I. 1985). "Nevertheless, the terms of the agreement must be clear and the possession or improvements in reliance thereon must be substantial and clearly shown." Id. (citing Star Dinette Appliance Co. v. Savran,104 R.I. 665, 666, 248 A.2d 69, 70 (1968); Tillinghast v. Harrop,63 R.I. 394, 9 A.2d 28 (1939)). A party seeking the benefit of the doctrine must demonstrate possession, improvements, or payments in reliance on the oral purchase agreement. Richard v. Richard, 900 A.2d 1170, 1175 (R.I. 2006). While each of these factors alone may not be sufficient to invoke the doctrine, a combination of all may be. Id. (citing Najarian v.Boyajian, 48 R.I. 213, 215, 136 A. 767, 768 (1927)). Thus, "[t]aking possession of property . . . together with making improvements or paying a substantial part of the purchase price, is generally sufficient to avoid the bar of the statute of frauds." Id. (quoting Pearl Brewing Co.v. McNaboe, 495 A.2d 238, 242 (R.I. 1985)) (modifications by Court).
Here, possession by Plaintiff is not disputed. Defendants' testimony verifies that Gary moved back to the Property in 1989 and, since 1992, has been the sole occupant thereon. When Defendants drove to Rhode Island in their recreational vehicle, they parked and stayed at their daughter's adjacent lot. The Court is mindful that the facts of a particular case may reduce the probative value of part performance as circumstantial evidence of an agreement for purchase. For example, where a child is seeking enforcement of an alleged agreement to purchase the property of his parents, and the child previously lived on the property as a boarder or renter, the court should consider such factors. SeeRichard, 900 A.2d 1170; Baumgartner v. Seidel, 75 R.I. 243, 65 A.2d 697
(1949). However, "a prior possession by the purchaser is not an absolute bar to proof of a change in the character of the possession after the making of a parol contract of sale, although it may cast upon the purchaser the burden of showing that his continued possession is referable to the contract." Richard, 900 A.2d at 1175-76 (quotingHerbstreith v. Walls, 147 Neb. 805, 807-08, 25 N.W.2d 409, 411 (1946)) (additional citations omitted). The Court notes however, that in these two cases involving an oral agreement between parent and child for the purchase of family property, evidence of part performance was used to overcome an absence of direct evidence of an agreement.Richard, 900 A.2d at 1172 (father claimed that, rather than a sale, he agreed to act as a bank to facilitate son's saving of down payment);Baumgartner, 75 R.I. at 246, 65 A.2d at 698 (father was deceased and siblings opposing enforcement denied any knowledge of agreement). Here, the probative value of Plaintiff's possession of the Property is not diminished by the family relationship and pre-existing residence because there is no question that an agreement existed.
It is also not disputed that Plaintiff has made substantial payments pursuant to the agreement. The 1997 memorandum calls for Plaintiff to make monthly mortgage payments of $1,723.29 to PCU. Taking only the eight years that passed between the date of that writing and the start of trial, 98 payments would have come due totaling in excess of $168,000. Plaintiff testified that he made all but one payment due and owing after assuming the PCU obligation; and David testified that up to the start of this trial, Gary had been making mortgage, tax, and insurance payments with the expectation of purchasing the Property. Plaintiff also made mortgage payments before and after that period, as well as tax and insurance payments, which are not included in this figure. The Court finds that Plaintiff has demonstrated partial, but substantial, payments under the purchase agreement reached with Defendants.
Defendants urge the Court to consider alleged delinquent payments and resulting late fees incurred during the course of Plaintiff's performance. Although Plaintiff acknowledged that Defendants made one PCU payment due to his financial difficulties, the Court reiterates that Defendants' evidence and testimony regarding additional payments made on Plaintiff's behalf was questionable and unpersuasive. The Court does accept that Defendants paid some bills on the Property, as Plaintiff testified to giving money to Carol to cover these. But the evidence before the Court does not support a finding of substantial breach by Plaintiff. On the contrary, Defendants testified that Plaintiff substantially met his obligations and never led Defendants to feel the deal was off. Furthermore, the burden would be on the Defendants to show any entitlement to recover for past payments they made on Plaintiff's behalf, and no reliable accounting allows such an assessment. Defendants have admitted that in 2003, years after these alleged payments, they reached an agreement for Gary to pay a $300,000 purchase price — fifty percent more than what he had offered in the past, and Gary agreed. Therefore, rather than relying on conjecture and questionable evidence, the Court finds that the parties considered their past performance in setting the purchase price in 2003.
With respect to improvements, it is especially relevant to note that "the statute of frauds is not to be taken lightly, and any partial performance must unequivocally indicate the existence of the purported oral agreement." Richard, 900 A.2d at 1175. Thus, the nature of improvements is important. The Court will consider improvements that "would have been improvident to make in the absence of some such contract, so that they are strong circumstantial evidence of its existence." Id. at 1176 (quoting 4 Corbin on Contracts (Statute of Frauds) § 18.15 at 541 (rev. ed. 1997)). Ordinarily, improvements showing part performance of an oral agreement must be permanent, as readily removable improvements are not such strong circumstantial evidence of reliance. R.W.P. Concessions, Inc., 487 A.2d at 132.
The Court finds that the improvements made by Plaintiff constitute strong circumstantial evidence that an oral agreement existed. Defendants seek to characterize Plaintiff's payments and his work as a substitute for rent, but the reference to "down payment towards purchase" in the 1997 memorandum belies such a characterization. Certainly, some of Plaintiff's efforts, such as grass-cutting and maintaining the chimney, would not justify an inference that an oral purchase agreement existed. However, Plaintiff made other substantial improvements to the Property that one would expect to be made by an owner, not a tenant. For example, the extensive work done to fix the stone wall and pond on the Property are clearly not removable. The Court finds persuasive Plaintiff's testimony regarding many hours of labor he himself put into these projects — "sweat equity" that is relevant to the part performance inquiry. See Richard, 900 A.2d at 1177. Plaintiff's efforts with respect to the building foundation, extensive landscaping, and driveway are also irremovable and show concern for the long-term value of the Property. Defendants point out that David lent assistance to Gary in some of the work on the Property. The exact division of work is not important, however, for the part performance doctrine requires Plaintiff to have made substantial improvements — which the Court finds here — not all improvements. R.W.P. Concessions, Inc., 487 A.2d at 131.
Plaintiff has demonstrated possession, partial payments, and substantial improvements on the Property; applicability of the part performance doctrine also requires a showing of reliance on the agreement. Reliance is all the more important here, for the family relationship and possession prior to agreement "may cast upon the purchaser the burden of showing that his continued possession is referable to the contract." Richard, 900 A.2d at 1175-76. The Court is satisfied that Plaintiff has met his burden here. The 1997 memorandum states that the mortgage and tax payments are "as a down payment towards purchase of home." This supports a finding of reliance not only with respect to Plaintiff's substantial payments, but also Plaintiff's possession and permanent improvements to the Property. With respect to his own labor on the Property, Plaintiff credibly testified that his siblings never assisted him in these efforts, even when asked, suggesting that the improvements were not made out of familial affinity, with the land intended to remain for Defendants' grandchildren. Finally, the Court accepts Plaintiff's testimony that, during the long period that he has possessed the Property, he knew of but disregarded opportunities to purchase other Rhode Island real estate in reliance on his agreement with Defendants. The Court finds Plaintiff's possession, partial payments, and substantial improvements on the Property in reliance on the oral agreement with Defendants, in combination, sufficient to demonstrate the existence of an agreement and allow enforcement despite the lack of a signed writing stating all essential terms.
Enforcement of an oral agreement under the part performance doctrine also requires that all terms of the oral agreement be clear. Here, Defendants' testimonial admissions and the signed 1997 memorandum make clear all the essential terms. The memorandum is only lacking a purchase price, which Defendants testified they agreed to set at $300,000. The Court, therefore, finds that the terms of the purchase agreement reached by Plaintiff and Defendants have been clearly demonstrated. Finally, given the substantial effort and expense that Plaintiff has put into the Property, and his forbearance from pursuing other purchase opportunities in the years since the agreement, the Court finds that denial of enforcement, despite Plaintiff's part performance, would be unjust. Accordingly, this Court is satisfied that the oral agreement reached by the parties is enforceable under the doctrine of part performance.
 D. Specific Performance
Plaintiff seeks the equitable relief of specific performance. "It is well established that in order for a court to award specific performance of a real estate contract, `the essential terms of the contract must be clear, definite, certain, and complete.'" Caito v. Juarez, 795 A.2d 533,536 (R.I. 2002) (quoting 71 Am. Jur.2d Specific Performance § 34 (2001)). "[The contract] must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties." St.Lawrence v. Reed, 74 R.I. 353, 357, 60 A.2d 734, 736 (1948) (quoting 49 Am. Jur. Specific Performance § 22 (1943)). Furthermore, a party seeking specific performance "must show that he was ready, able and willing to perform his part of the contract." Griffin v. Zapata, 570 A.2d 659, 662
(R.I. 1990) (quoting Jakober v. E.M. Loew's Capitol Theatre, Inc.,107 R.I. 104, 114, 265 A.2d 429, 435 (1970)). A party seeking specific performance of an oral agreement must establish the terms by clear and convincing evidence. Doyle v. McNulty, 478 A.2d 577, 579 (R.I. 1984). The remedy of specific performance rests in the sound discretion of the trial court. DePetrillo v. Lepore, 871 A.2d 907, 909 (R.I. 2005).
The Court finds specific performance appropriate here. The Defendants' stipulation, at trial, to all facts contained in the affidavit of Joseph Danti, Plaintiff's brother-in-law, demonstrates the clarity and definition of the purchase terms. Mr. Danti stated that he was present at the second August 2003 conversation between Gary and David and, when he suggested giving father and son some privacy, was asked by both parties to remain and be a witness. (Pl. Ex. 5, Affidavit of Joseph Danti, ¶¶ 7-10.) Mr. Danti then quotes Gary as stating, "so Dad, just so there can be no misunderstanding, the deal that we have is that I will pay off the PCU loan, pay you the sum of $300,000?" (Id. ¶ 11.) David responded that this was correct. (Id.) Gary further stated, "the deal is for the farmhouse and all the acreage, no cutting any piece out or splitting it up," to which David stated, "yes, yes, all of it." (Id. ¶ 12.) David also made the statements: "that's our deal, I will have to deal with your brother and sister," "start the paperwork, call your lawyer, let's get this thing done," and indicated that Carol was in agreement with these representations. (Id. ¶¶ 13-15.) These are statements of agreement that clearly indicate an intent to be bound and to conclude the purchase that the parties had discussed for many years. Carol now contends that she never gave her necessary agreement to these conclusive terms, especially that there would be no additional carve-out for the grandchildren. However, her trial testimony was not consistent on this point, as she acknowledged having reached an agreement for the $300,000 purchase price before ever discussing such a carve-out with Plaintiff. The course of dealings indicates that Carol was involved in this agreement — by drafting the 1997 memorandum, for example — and the Court finds that she was in agreement with the final terms. Plaintiff has met his burden of demonstrating by clear and convincing evidence that, in August 2003, there was a clear, definite, certain, and complete understating between the parties as to the essential terms of this contract.
The evidence also indicates that Plaintiff was ready, able, and willing to complete his performance of the contract. The parties stipulated at trial that Gary's father-in-law had the resources and was willing to fund Plaintiff's cash purchase. The PSA, which Plaintiff had prepared at David's suggestion, provides for "a first mortgage of $300,000.00 at four (4) percent interest per annum for 15 years amortized over 25 years." (PSA, Plaintiff's Exhibit 2.) Although David testified that a cash payment and a mortgage at four percent interest were both agreed as options, there is no evidence that these further specifics were agreed to. The trial testimony and stipulation confirm that, until the agreement was derailed by Defendants' change of mind, Plaintiff was prepared to complete a cash purchase and so informed Defendants. Given the contentious nature of this dispute and lack of communication between the parties, Defendants' taking a mortgage on the Property is likely to lead to more family conflict. Specific performance is an equitable remedy and, in granting it here, the Court finds that it is in the best interests of the parties that Defendants not be compelled to participate in financing this transaction. Plaintiff will be ordered to complete the transaction as a cash purchase.
After review of all the evidence before it, the Court finds that a complete and definite purchase agreement existed between the parties, which Plaintiff was prepared to complete. This agreement should be specifically enforced as Plaintiff has established entitlement by clear and convincing evidence.
 E. Other Defenses
In their initial pleading to Plaintiff's Complaint, Defendants raised several affirmative defenses in addition to their statute of frauds claim: waiver, release, estoppel, laches, undue influence, and failure of consideration. It has been held that "[s]imply stating an issue for . . . review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."Catucci v. Pacheco, 866 A.2d 509, 516 (R.I. 2005) (quotingWilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I. 2002)). Here, Defendants have simply stated these affirmative defenses, without a meaningful discussion or legal briefing to substantiate their claims. The Court does not find meritorious grounds for these defenses in the evidence presented that would warrant further consideration. Therefore, the Court finds Defendants have waived these affirmative defenses, and will not address them.
 F. Costs and Attorney's Fees
Plaintiff also requests the Court to order Defendants to pay his costs and attorney's fees. A prevailing party in a civil action is entitled to recover costs as of course except where otherwise specially provided, or as justice may require. Super. R. Civ. P. Rule 54(d). Granting the costs of depositions, if objected to, rests within the Court's discretion if it finds the depositions were reasonably necessary. Rule 54(e). Attorney's fees, on the other hand, may not be awarded to the prevailing party as a matter of course, but only where authorized by statute or a contractual provision. Capital Properties, Inc. v. City ofProvidence, 843 A.2d 456, 459 (R.I. 2004). General Laws 1956 § 9-1-45
allows an award of attorney's fees in a civil action for breach of contract where the Court finds "a complete absence of a justiciable issue of either law or fact raised by the losing party."
With respect to attorney's fees, no contractual provision exists here authorizing such an award. And the Court finds that, although Defendants have not prevailed, their statute of frauds defense was not without merit. Therefore, Plaintiff's request for attorney's fees is denied. The Court finds, however, that Plaintiff's other costs, including depositions taken of Defendants, were reasonable and necessary. Therefore, Plaintiff is entitled to recover reasonable costs as the prevailing party under Rule 54.
 Conclusion
The Court has concluded that although the parties did not memorialize their real estate sale contract in a signed writing containing all essential terms, the statute of frauds is satisfied in this case by Defendants' trial admissions as to the essential terms of the agreement. Furthermore, apart from these admissions, Plaintiff has demonstrated sufficient possession, payments, and improvements in reliance on the agreement to satisfy the statute of frauds under the doctrine of part performance. Additional defenses raised in response to Plaintiff's complaint have not been addressed by Defendants and are waived. Judgment is therefore rendered in favor of Plaintiff, who is entitled to specific performance of the agreement reached.
Defendants are ordered to convey the Property in its entirety to Plaintiff for the purchase price of $300,000, plus any mortgage obligation to the PCU that remains on the Property. Each party must bear his or her own attorney's fees. Reasonable costs pursuant to Rule 54 are recoverable by Plaintiff and may be presented to this Court for review. Counsel shall submit an appropriate order for entry.
[1] The real estate in dispute ("the Property") consists of approximately 82 acres and is located at 55 Blankinton Drive in Glocester, Rhode Island (Assessor's Plat 14, Lots 7 and 22).
[2] "Subject: Gary A. King agrees to pay for Mortgage with Pawtucket Credit Union: monthly installments of $1,723.29 and Taxes accrued for said property at 55 Blackinton Drive, Chepachet, RI which will be as a down payment towards purchase of home. This agreement will be in place until said time couple can acquire mortgage for property. Any adjustments will be made at that time for the payments made under this agreement." (Emphases in original.)
[3] With respect to the purchase price, Plaintiff's Complaint alleges that an agreement was reached for him to pay $200,000 as the purchase price, which Defendants modified, with his acquiescence, in 2003. Although Plaintiff now appears to seek enforcement at the $300,000 price, he has also argued that the modification was without consideration and, therefore, unenforceable. Therefore, the Court finds it necessary to briefly address whether an agreement for a $200,000 purchase would be enforceable. Although David's trial testimony was somewhat equivocal on the point, he maintained that the $200,000 figure was suggested by Gary, but that Defendants found it unacceptable. Carol likewise did not admit to such an agreement. Furthermore, the 1997 memorandum can be read to contemplate the setting of a purchase price at a later date, just as it contemplates closing to occur at the time Plaintiff obtains a mortgage. Therefore, the Court finds that the admissions exception to the statute of frauds does not render the alleged agreement at a lower price enforceable.