HARRY DUREPO *et al. vs.* LEWIS N. MAY *et al.*

JUNE 27, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

72

CAPOTOSTO, J.   This is a bill in equity to compel the specific performance of a contract for the sale of certain land located in the town of South Kingstown, in this state.  It is alleged that the contract was completed when the complainants exercised an option to purchase the land, which option was contained in a lease from Charles S. Adams to Alberie E. Albert.  Adams died before the option was exercised.  The respondents, Harriet L. Adams, Robey L. Gilbert, Susan P. May, and Lewis N. May, are all the parties in interest in the manner and to the extent hereinafter indicated.

After a hearing in the superior court upon bill, answer, replication and proof, a final decree was entered dismissing the bill.  Complainants have appealed to this court stating that the decree is against the law and against the evidence.

Charles S. Adams died in August, 1938, intestate, leaving his widow, Harriet L. Adams, a brother, George C. Adams, and two sisters, Susan P. May and Lydia E. A. May.  Robey L. Gilbert was duly appointed and qualified as administratrix of the estate.  In December, 1938, Lydia conveyed her interest in the premises to Lewis N. May; and in July, 1940, following the death of George, he acquired George's interest from the latter's heirs.  When the bill was brought Lewis N. May therefore was possessed of a two-thirds' interest and Susan P. May of a one-third interest in the premises.

On August 29, 1936, Charles S. Adams leased the premises in question to Alberie E. Albert for the period from March 2, 1937 to March 1, 1941.  The lease contained the following option: "The Lessor hereby grants to said Lessee an option to purchase said demised premises with all buildings and appurtenances thereon for the purchase price of Nine Thou-

sand Five Hundred ($9,500.00) Dollars to be paid as follows: The sum of Three Thousand ($3,000.00) in cash at the time of the exercise of said option, and the sum of Fifteen Hundred ($1,500.00) Dollars with interest at Five (5) Percent per year on the unpaid balance to be paid one year from the time of the exercise of said option, and the sum of Fifteen Hundred ($1,500.00) Dollars with said interest to be paid each year thereafter until the balance is paid in full. Provided: that said Lessee in exercising said option shall give to said Lessor a written notice of his intention to so exercise said option at least one month prior to said exercise."

On October 30, 1937, Alberie E. Albert, the lessee, executed an instrument entitled "Assignment Of Leases", by which he assigned to the complainants four different leases from three different lessors. The lease of the premises in question was one of those leases and is described as follows in that instrument: "A certain lease bearing date of August 29, 1936 made by Charles S. Adams to Alberie E. Albert." Attached to the instrument of assignment is a document executed by Charles S. Adams, dated November 1, 1937, by which he assented to the assignment and altered the option hereinbefore quoted by reducing the initial payment therein set at $3000 to $1500. The remaining terms of the option were not changed. The assignment was recorded May 22, 1940 and the lease on August 5, 1940. We recall here that respondent Lewis N. May acquired Lydia E. A. May's interest in the premises in December, 1938, and that of the heirs of George C. Adams in July, 1940.

On January 3, 1941, the complainants sent identical letters, by registered mail, to the respondents Lewis N. May and Susan P. May, in which, after identifying the lease and the assignment, they gave "notice that they intend to exercise the option to purchase said real estate and improvements thereon, as provided in said lease and assignment thereof and are prepared from this date on, to meet the provisions of payment as set forth in said option. Will you kindly advise the undersigned of the date on which the deed may be ex-

pected." Noncompliance with this notice resulted in the present proceedings.

The trial justice denied and dismissed the bill on the ground that the option was too indefinite to enforce in equity by a decree for specific performance. The respondents Lewis N. May and Susan P. May urge this ground, among others, as their main contention before us. On the other hand, the complainants, as well as the widow and the administratrix of the estate of Charles S. Adams, the lessor, contend that the option is sufficiently definite for specific performance.

Respondents May first contend that the option is void because no time limit is specified therein within which the lessee should exercise the option. They argue that because of such omission the option is too vague and indefinite for specific performance and, further, that it violates the rule against perpetuities. We find no merit in this contention.

■■ In the absence of stipulation, it is ordinarily held that a contract for the sale of land is to be performed within a reasonable time. What is a reasonable time depends upon the circumstances of each case. We see no reason why this rule should not be applied in the case of an option to sell land. Furthermore, the option in the instant cause was incorporated in a lease for the term of four years. Since the parties fixed no time for the exercise of the option, it is reasonable to infer that they intended that the option could be exercised at any time within the term of the lease, which, in the circumstances, they apparently deemed a reasonable time. The evidence shows that notice of the exercise of the option was duly given within that time.

Respondents May next contend that the option is unenforceable by reason of uncertainty, in that it fails to specify when the deed was to be delivered and how the purchase money was to be secured, if at all. The trial justice, disregarding the evidence and confining himself strictly to the language of the option, adopted this view and dismissed the bill on those grounds. In our judgment this was error.

The omissions just mentioned, upon which the respond-

ents May strongly rely, are details concerning the passing of title to the land in question and do not refer to the necessary particulars that ordinarily must appear in a memorandum to meet the requirements of our statute of frauds, general laws 1923, chapter 333, sec. 6, now G. L. 1938, chap. 481, §1, which in part is as follows: "§1. No action shall be brought:—*First.* Whereby to charge any person upon any contract for the sale of lands . . . Unless the promise or agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith . . . ."

██ The statute does not require that a contract for the sale of land or an agreement giving an option for the purchase thereof must be in writing. Even though such a contract or agreement be oral, it will be enforced if there is a sufficient memorandum in writing. *Preble v. Higgins,* 43 R. I. 10. A memorandum to comply with the statute of frauds need contain only the substance of the contract or agreement and not a statement of all particulars. *Ives v. Hazard,* 4 R. I. 14. The rule is the same in the case of an option. In *Sholovitz* v. *Noorigian,* 42 R. I. 282, at page 285, this court, speaking generally with reference to the adequacy of a memorandum, said: "The note or memorandum sufficient to prevent the operation of the statute upon a contract for the sale of land need not have the formal precision usually found in a written contract or agreement. Such note or memorandum meets the requirements of the statute if it sets out who are the seller and the buyer, their respective intention to sell and to purchase, such a description of the subject matter of the sale as may be applied to a particular piece of land, the purchase price, and the terms of payment if the sale is not for cash; and further such note or memorandum must be signed by the party to be charged in the action or by his agent lawfully authorized." All these elements are present in the option under consideration.

██ If, in the instant cause, the sale were for cash and no time for performance was fixed in the option, there can be

no doubt that the parties would be held to have intended that the title should be passed in the ordinary way, that is, that the delivery of the deed and the payment of the purchase price were to be concurrent acts. *Bright* v. *James,* 35 R. I. 128; *Bergeron* v. *Redfern,* 108 A. (R. I.) 650. Does the fact that here the purchase price was to be paid by a down payment and installments make a difference? In our judgment the omissions under consideration are matters of detail, which, if not inferable from the language of the option itself, could be supplied by oral evidence.

■ Where the parties fail to stipulate as to such matters, it is reasonable to infer that they intended to follow the ordinary practice in the sale of real property under similar circumstances, namely, that upon delivery of the deed the seller would give a mortgage, with terms in accordance with those specified in the option, for the balance of the purchase price. Were it necessary to supply the above-mentioned details, there is, in the record before us, uncontradicted evidence by complainant Durepo, who knew Adams and whose land he occupied under the lease with his consent, that the complainants intended to give a mortgage covering the premises when the deed was delivered. On our construction of the option as written, aided if necessary by the evidence just mentioned, we are of the opinion that it was sufficiently definite for the enforcement of specific performance.

■ Respondents May further contend that the complainants should not prevail because they failed to tender the first payment called for by the option. This contention is without merit. Where, as in the instant cause, according to our view of the option, the giving of the deed and the payment of the purchase price, or its equivalent, are to be concurrent acts, the strict rule of tender does not apply. It was sufficient for the complainants here to show, as they did by ample evidence, that they were able, ready and willing to perform their part of the agreement constituted by the exercise of the option. *Fournier* v. *Cass,* 49 R. I. 35.

■ When a memorandum meets the requirements of the

statute of frauds, a lessee, who exercises an option to purchase contained in the lease, may, in a bill for specific performance against the heirs of the lessor or anyone who purchases the property with notice of the option, compel a conveyance of the premises. In the instant cause it is clear that the respondent Susan P. May, an heir of the lessor, was bound by the option as to her one-third interest in the land. The respondent Lewis N. May contends, however, that he was an innocent purchaser without such notice of the remaining two-thirds' interest. As the trial justice did not consider the evidence and therefore made no finding on this point, we must ourselves review the pertinent evidence in order to pass on this issue.

It is undeniable that the recording of the lease, which contained the option, and of the assignment was unusual, but this in itself does not establish that the respondent Lewis N. May had no notice of the option. He testified that Lydia E. A. May, an heir of the lessor, gave him her one-third interest in the land, which she inherited from her brother, as a gift. In this situation and as to that portion of his interest in the land, he was charged with notice of the option by the provisions of G. L. 1938, chap. 435, §1. His other one-third interest he purchased from the heirs of the lessor's deceased son, George. This conveyance was subsequent to the recording of the assignment in which the lease containing the option was identified. Even though the lease was not recorded until after the conveyance from George's heirs, the reference to the lease in the recorded assignment was a circumstance that should have put him on notice, especially since the complainants had then been in open and notorious possession of the premises for some considerable time, which fact imposed upon him the further obligation of making reasonable inquiry to ascertain the nature and extent of that possession. 5 Tiffany Real Property (3d ed.) §1287.

Turning to the evidence on this point, complainant Durepo testified that, in the fall of 1937, he asked Lewis N. May for a lease of some land belonging to the latter "with

an option to buy, such as I had on the Adams farm." Hubert L. Kelly, a former employee of the complainants, testified that, in May or June, 1938, May asked him whether the complainants had bought the Adams property and he then told May that "it was leased with an option." May denied that he ever had any such talk with either Durepo or Kelly. Upon careful consideration of all the evidence on the point under discussion, our judgment is that Lewis N. May had either actual or constructive notice of the option in question here.

The last question for consideration is whether, when title to the premises described in the option is given, the purchase price belongs to Charles S. Adams' heirs or to his personal representatives; in other words, whether the purchase price is to be deemed real or personal property. The answer to this question depends upon whether or not the doctrine of equitable conversion applies. With few exceptions, the American decisions are in square conflict with the English decisions on this point. The English cases generally hold that where the owner of land dies between the time of the giving of an option and its exercise, the purchase money goes to his personal representatives and not to his heirs. The great weight of American authority holds to the contrary.

The English rule was first applied, so far as we are aware, by Lord Kenyon in *Lawes* v. *Bennett*, 1 Cox C.C. 167 (1785), hereinafter usually referred to as the *Lawes* case. That case has since been followed in England with apparent reluctance and has been restricted in its application whenever possible. We note here that until the case of *In re Isaacs* (1894), 3 Ch. Div. 506, to which we will refer later, a will was involved in every English case that has come to our attention; and that consideration of the will apparently assisted the court in applying the doctrine of equitable conversion, as in the *Lawes* case. This court followed the *Lawes* case in *Newport Water Works* v. *Sisson*, 18 R. I. 411, where, as in the English cases, a will was involved. In the later case of *McCanna* v. *Hanan*, 49 R. I. 349, which

also involved a will, the *Newport Water Works* case was incidentally discussed by this court. In view of such a situation, we wish it understood that whatever we say in this opinion shall not apply in any way to a case involving a will.

The following summary review of the English and American authorities starts with the case of *Lawes* v. *Bennett, supra.* In that case a lease contained an option to purchase the demised premises for £3000. The lessor died before the option was exercised, leaving a will, made several years before the lease, by which he devised all his real estate to his cousin, John Bennett, and all his personal property in equal parts to him and to his sister, Mary. In due time the option was exercised and the conveyance made. Thereafter Mary claimed one half of the £3000. In a brief opinion, with little argument and no citation of authority in point, Lord Kenyon, expressing some doubt, held that although no stress could be laid upon the will, as it contained only general language, yet "if a man seized of a real estate contract to sell it, and die before the contract is carried into execution, it is personal property of him"; and that "when the party who has the power of making the election has elected, the whole is to be referred back to the original agreement, and the only difference is, that the real estate is converted into personal at a future period."

As far as we have been able to observe, the *Lawes* case has apparently been followed, when escape from its application was not possible, mainly out of respect to the eminent jurist who decided that case. In *Townley* v. *Bedwell* (1808), 14 Ves. Jr. 591, 33 Eng. Reprint 648, Lord Eldon, who was counsel for the heirs in the *Lawes* case, while adopting the rule of that case, clearly intimated, however, that it did not meet with the entire approval of the courts. In his peculiar situation, it is open to question whether in so doing he was moved more by deference to Lord Kenyon than by his conviction of the soundness of the decision in the *Lawes* case.

In *Collingwood* v. *Row,* 3 Jur. (N.S.) 785 (1857), at page

786, the court said: "The only question, then, is, whether this is to be taken as realty or personalty; and I confess I should have felt very great doubts if it were res integra, as very great inconveniences might follow . . . . It is a very singular and inconvenient state of things; but if the question has been decided by so great a man as Lord Kenyon— and his decision has been followed by Lord Eldon, though he seems to have had some doubt about it, and might have decided otherwise, but he comes to the conclusion that he ought to follow *Lawes* v. *Bennett*, (1 Cox, 167)—whatever doubts I might entertain as to that decision, I am bound to follow it." And in *Edwards* v. *West* (1878), L.R. 7 Ch. Div. 858, at page 863, the court used the following language: "Now, whether *Lawes* v. *Bennett* is or is not consistent with the general principle upon which conversion has been held to exist, it is not for me to say. It is enough for me to say that the case has been followed in numerous other cases, though it has been observed upon by more than one Judge as somewhat difficult of explanation."

Until the decision in *In re Isaacs, supra,* the English courts limited application of the *Lawes* case as far as possible. In *Townley* v. *Bedwell, supra,* although Lord Eldon followed that case, yet he held that the equitable conversion did not reach the rents accruing after the testator's death and before the exercise of the option and, therefore, gave those rents to the heirs. In *Drant* v. *Vause,* 11 L.J. Ch. (N.S.) 170, the court held that the case was distinguishable from the *Lawes* case because the will there involved, which the owner of the land had made before the option was exercised, contained a specific devise of that land, and therefore gave the purchase money to the devisee. The cases of *Emuss* v. *Smith,* 2 De G. & Sm. 722, and *In re Pyle* (1895), 1 Ch. Div. 724, are to the same effect.

*In re Isaacs, supra,* goes further in applying the rule of the *Lawes* case than any other English case that has come to our attention. In the *Isaacs* case the owner of land gave a lease with an option to purchase exercisable only after his

death. He died intestate. The court, after adverting to the contention that the *Lawes* case had never been applied to a case of intestacy, at page 509 of the opinion, said that "notwithstanding any subsequent case, it appears to me to apply, without any possible limitation or qualification, to the case of an intestacy."

The great weight of American authority is against applying the rule of the *Lawes* case in the same or similar circumstances. The decided trend of the decisions in this country is that the exercise of an option to purchase real property after the death of the owner does not relate back to the time of the option agreement so as to affect, under the doctrine of equitable conversion, the rights of the owner's heirs or devisees. *Rockland-Rockport Lime Co.* v. *Leary,* 203 N. Y. 469; *Adams* v. *Peabody Coal Co.,* 230 Ill. 469; *Sheehy* v. *Scott,* 128 Iowa 551; *Inghram* v. *Chandler,* 179 Iowa 304; *Estate of Bisbee,* 177 Wis. 77; *Smith* v. *Loewenstein,* 50 Ohio St. 346. As already stated, we followed the *Lawes* case in *Newport Water Works* v. *Sisson, supra,* which latter case was subsequently commented upon in *McCanna* v. *Hanan, supra.* Dicta in accordance with the *Lawes* case appear in *Smith Co., Inc.* v. *Anderson,* 84 N. J. Eq. 681, 687, and *McKay* v. *Carrington,* 1 McLean (C. C. Ohio) 50, 54.

The rule of the *Lawes* case has been the subject of criticism by legal writers both in England and in this country. See Sweet, Options of Purchase Contained in Leases, 55 Sol. J. 360, 361 (1911), where the writer characterized that rule as a "blot" on the law relating to equitable conversion; 2 Jarman on Wills (7th ed.) 712; Hart, Inconsistencies of Equitable Conversion, 24 Law Quar. Rev. 403, 406; Langdell, A Brief Survey of Equity Jurisdiction (2d ed.) 260. For valuable notes on the subject, see Annotations, 50 A.L.R. 1322, 57 L.R.A. 643.

The distinction between an option to purchase real property, which is but a continuing offer for a limited period that may never be accepted, and a contract to sell such property, where both parties are mutually bound, is, in our judgment,

of controlling force in applying the doctrine of equitable conversion. As we have already indicated, in the case of an option the authorities are in serious conflict on the question of whether the doctrine of equitable conversion applies in circumstances similar to those in the instant cause. On the other hand, speaking generally, the authorities uniformly hold that in the case of a contract the owner's personal representatives and not the heirs are entitled to the purchase price. See Annotation, 57 L.R.A. 643.

Excluding cases in which an owner's will is involved, as to which we express no opinion in this cause, we find great difficulty, on principle, in applying the doctrine of equitable conversion in the circumstances now before us. To apply that doctrine here we would have to hold that when an owner gives to a stranger a mere option to purchase his real property he thereby intends to convert that property from real to personal property for all purposes, and further that, in the event of his death before the option is exercised, he intends that the purchase price be paid to his personal representatives, thus leaving the devolution of his estate at the will of a stranger.

In the absence of language in the option indicating such intention, we are unable to view an option in that light. Unless resort is had to conjecture, it is difficult to believe that, at the time a mere option to purchase real property is given, the owner has in mind that he may die before it is exercised, and still more difficult to believe that he is then concerned with the character of his estate upon his death and whether such estate shall go to his heirs or to his personal representatives.

It is therefore our opinion that the doctrine of equitable conversion is inapplicable in the circumstances of this cause, and that; upon the conveyance of the property in question to the complainants, the purchase price shall go to the heirs of Charles S. Adams, as their respective interests may appear.

The complainants' appeal is sustained, the decree appealed from is reversed, and on July 7, 1947, the parties may present to this court a form of decree, in accordance with this opinion, to be entered in the superior court.

*J. Russell Haire*, for complainants.

*John P. Cooney, Jr.*, for respondents May.

*Adolph Gorman*, for respondent Robey L. Gilbert.