# United States Court of Appeals
## For the First Circuit

No. 24-1314

W.R. COBB COMPANY,

Plaintiff, Appellant,

v.

V.J. DESIGNS, LLC, d/b/a Galili & Co.; BENJAMIN GALILI,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Thompson, Circuit Judges.

Robert D. Fine, with whom Chace Ruttenberg & Freedman, LLP
was on brief, for appellant.
Kevin J. Bristow for appellees.

February 28, 2025

**THOMPSON, Circuit Judge.** This case involves a diamond business that never got off the ground. Appellant W.R. Cobb Company ("Cobb" or "Appellant") wanted to make and sell diamond products under the prestigious Forevermark brand -- one associated with high-quality diamonds. Unable to secure a license directly from Forevermark, Cobb sought out one of Forevermark's existing licensees, Appellee VJ Designs LLC ("VJ Designs" or "VJ") to propose a business collaboration. Eventually, the parties entered an agreement (the "Letter Agreement") to form a new company, called WR Cobb/VJ LLC ("Cobb/VJ" or the "Joint Entity"), that would "operate a Forevermark business under the Forevermark license." The wrinkle -- and a very big one -- was that VJ Designs could not sub-license, assign, or transfer the rights it licensed from Forevermark to another party, unless Forevermark agreed in writing.

Within months of closing the deal, the parties' venture fell apart. In the aftermath, Cobb sued VJ Designs and its owner Benjamin Galili (collectively, "Appellees") to recover funds it paid VJ under the Letter Agreement. Chief among Cobb's grievances was that VJ never assigned its rights under the Forevermark license to Cobb/VJ as the Letter Agreement purportedly obligated it to do. Following a two-day bench trial, the district court entered judgment in favor of Appellees on Cobb's breach of contract and misrepresentation claims. On appeal, Cobb argues that the district

court erred in not rescinding the Letter Agreement (i.e., Cobb wanted the district court to restore the parties to the status quo commercial positions they would have held had they never entered the Letter Agreement).  Having carefully reviewed the full record and the parties' arguments, we affirm.

**BACKGROUND**

We recount the course of the parties' relationship consistent with the district court's factual findings following the bench trial, which are largely unchallenged on appeal, drawing additional details from the record as necessary to paint a complete picture.  González-Rucci v. INS, 539 F.3d 66, 67 (1st Cir. 2008).

**A.    Cobb's Quest For a Forevermark License**

W.R. Cobb Company is a jewelry manufacturer based in East Providence, Rhode Island, and, as noted, it wanted to sell diamond products under the Forevermark brand.  Forevermark-branded diamonds are industry-recognized "premium quality" diamonds bearing an inscription of the Forevermark logo and a serial number identifying the specific diamond.  Such diamonds command a higher price in the jewelry market than non-Forevermark-branded diamonds.  Despite Cobb's long-standing efforts to obtain a Forevermark license, Forevermark would not issue one to Cobb.

Undeterred, Cobb came up with a supposed workaround and decided to pursue acquisition of a business that Forevermark had already licensed, VJ Designs.  At the time, VJ Designs was a

jewelry company with a location in New York City, whose sole owner was Benjamin Galili. A look at a few of the contractual terms in VJ Designs' licensing agreement with Forevermark sheds some light on what triggered the parties' dispute. That contract (the "License") permitted VJ, in general terms, to manufacture, advertise, sell, and offer for sale Forevermark products using Forevermark marketing materials. These rights were "personal, non-transferable, [and] non-assignable," though the License contemplated that Forevermark could "agree[] in writing in advance to a proposed assignment, sub-license or transfer." The License further permitted Forevermark to "immediately terminate" the contract if VJ Designs "under[went] or propose[d] to undergo a Change of Control . . . which, in [Forevermark's] opinion, is likely to materially affect [VJ's] ability to carry out [VJ's] obligations under the Agreement."

## B.  Cobb and VJ Negotiate the Letter Agreement

Cobb began negotiating with VJ Designs in 2016. Roderick Lichtenfels, Cobb's President and CEO, sent letters in 2016 and 2017 offering either to purchase VJ Designs outright or to "assume ownership" of the License. Importantly, both of these early offer letters from Cobb expressly identified, as a condition precedent, "[t]he consent of FOREVERMARK for [Cobb] to assume [VJ Designs'] License Agreement."

- 4 -

Throughout 2018, Cobb and VJ Designs continued to discuss a potential deal. As part of the talks, on March 9, 2018, (VJ's) Galili emailed (Cobb's) Lichtenfels a copy of the License. A week later, Lichtenfels acknowledged in an email to Galili that any agreement "would need to be contingent upon Forevermark's approval for W.R. Cobb or one of its entities to assume ownership of VJ or the license." On May 30, 2018, Cobb and VJ Designs executed the Letter Agreement, which provided that the new Joint Entity, Cobb/VJ, "shall operate a Forevermark business under the Forevermark license with other assets related to the Forevermark business that [Cobb] and its affiliate are purchasing from VJ pursuant to the terms and conditions of this letter agreement." Notably, during the parties' drafting process, this language supplanted a provision that VJ Designs would "transfer the Forevermark license" to the Joint Entity.

Both parties agree that the final Letter Agreement structured ownership of the Joint Entity to give VJ a majority interest, with an eye towards alleviating Forevermark's concerns regarding the Joint Entity's use of Forevermark's brand.[1] In particular, the Letter Agreement provided that, at the outset of

---

[1] Of course, the parties disagree as to whether the ownership scheme was sufficient to secure Forevermark's consent to assignment of the License to the Joint Entity (as Cobb asserts), or merely Forevermark's permission for the Joint Entity to operate as an extension of VJ Designs (as VJ says).

the joint venture, VJ Designs would own 51% of Cobb/VJ and Cobb would own the remaining 49%.[2] The agreement further expressly contemplated, using some seemingly odd commercial language, that once Forevermark became "comfortable with" Cobb, Cobb would "assume ownership of VJ's 51% interest" and thus have full ownership over the Joint Entity Cobb/VJ.[3]

Although VJ was the majority owner, the Letter Agreement stripped VJ Designs of "profits" and "distributions" associated with ownership and instead offered alternative forms of compensation for VJ. In a section of the Letter Agreement setting forth the "management services" VJ Designs would provide to the Joint Entity, the parties agreed that VJ would receive a share of the profits (with the percentage varying based on how much profit was realized). This tiered profit-sharing arrangement would survive cancellation of the "management services" section, which

---

[2] More accurately, Cobb's ownership interest in Cobb/VJ would be held by Wenham Enterprises, LLC ("Wenham"), an affiliate of Cobb's which was also owned and controlled by Lichtenfels. The parties have given us no reason to distinguish between Cobb and Wenham for the purposes of this appeal. For the sake of simplicity, we refer to Wenham's ownership interest in the Joint Entity and rights under the Letter Agreement as Cobb's.

[3] That said, we cannot help but notice, that regardless of VJ's ownership share, the Letter Agreement granted Cobb functional control over Cobb/VJ from the outset. The Letter Agreement "entitled [Cobb] to all voting rights and ownership rights and profits/losses and distributions not only for its own 49%, but also for VJ's 51%." As Lichtenfels testified at the bench trial, VJ's ownership of Cobb/VJ was "on paper" and "nominal."

the Letter Agreement permitted either party to cancel with 60 days' written notice. The Letter Agreement also provided for two up-front payments from Cobb to VJ Designs. "Simultaneously with . . . execution," Cobb would pay VJ Designs (1) "the nonrefundable amount of $125,000 for the license, models and molds, CAD's,[4] office furnishing and equipment, computers and software, customer information and rights and obligations to VJ's lease for its office space" and (2) an "advance [in] the amount of $150,000 for [VJ Designs'] Forevermark loose diamond and finished product/sample inventory." As the advance suggests, the Letter Agreement contemplated that VJ would sell its inventory of Forevermark products to Cobb/VJ, as well as to non-retail customers, so long as those customer sales did not compete with Cobb/VJ.

C.    **The Venture Begins and Ends**

In performance of the Letter Agreement, on May 31, 2018, Cobb transferred $275,000 to VJ for the purchased assets and as an advance on purchases of inventory. From there, the parties' relationship quickly took a turn for the worse as the joint venture

---

[4] "CADs" or "CAD files" are computer-aided designs that, as relevant to this case, are used to display a 3D model of a piece of jewelry and to create wax molds for jewelry.

encountered a number of obstacles not relevant to the primary issues raised in this appeal.[5]

On August 8, 2018, Galili notified Lichtenfels and Cobb that he was cancelling the management services portion of the Letter Agreement in 60 days. Thereafter, the parties continued to communicate regarding their joint venture through the end of August. As best we can tell from the record before us, Cobb ultimately abandoned the venture, though the date of its withdrawal is unclear. See W.R. Cobb Co. v. VJ Designs, LLC, No. 1:18-cv-00551-MSM-LDA, 2024 WL 1230268, at *3 (D.R.I. Mar. 22, 2024). At no point during the venture were VJ's Forevermark rights under the License assigned to Cobb/VJ.

Cobb filed this lawsuit on October 3, 2018, asserting a claim for breach of contract against VJ Designs and misrepresentation and fraud claims against VJ Designs and Galili. After a two-day bench trial, the district court entered judgment for VJ Designs and Galili on each of Cobb's claims.[6] Id. at *8.

---

[5] For instance, Cobb complained that VJ had not transferred various assets related to its jewelry business. Meanwhile, VJ Designs and Galili expressed frustration that Cobb had not provided purchase orders for VJ Designs' remaining inventory (recall the $150,000 advance payment for said inventory), and had not acquired any new customers for the Joint Entity, which meant that VJ Designs was not receiving any shared profits.

[6] Appellees counterclaimed below that Cobb breached the Letter Agreement. The district court's post-trial decision concluded that although Cobb breached the Letter Agreement by abandoning the joint venture, Appellees' counterclaim failed because they did not

- 8 -

## STANDARD OF REVIEW

Where, as here, the district judge fills the role of factfinder, we review those findings for clear error. Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 420 (1st Cir. 1996). That standard "constrains us from deciding factual issues anew." Id. Moreover, "we may not disturb the district court's record-rooted findings of fact unless on the whole of the evidence we reach the irresistible conclusion that a mistake has been made." Id. Similarly, "we cannot second-guess the [district] court's credibility determination[s]." Calderón-Ortega v. United States, 753 F.3d 250, 253 n.1 (1st Cir. 2014). "[T]his deference makes perfect sense: . . . the trial court 'sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way which appellate courts cannot hope to replicate.'" Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26, 33 (1st Cir. 2019) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)). On the other hand, we review the district court's legal determinations de novo, affording them no deference. United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001).

---

prove damages. W.R. Cobb, 2024 WL 1230268, at *8. That ruling has not been appealed.

- 9 -

**ANALYSIS**

On appeal, Cobb asserts that the district court erred by not rescinding the contract based on either a material breach of contract, fraud, misrepresentation, or mutual mistake. Cobb also claims the district court erred in not holding Galili personally liable for fraud and misrepresentation.[7]

**A. Has the Remedy of Rescission Been Waived?**

As a threshold matter, the Appellees argue that we should not consider Cobb's request for rescission because Cobb did not plead rescission as an equitable cause of action and/or request it as a remedy in the complaint. However, we can handle this argument with some dispatch. Before we explain, we pause to note that the parties appear to agree that Rhode Island law governs this dispute, as both cite to Rhode Island cases throughout their briefs. See Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000) ("State law supplies the substantive rules of decision in diversity cases."). In its Decision and Order, the district court also found Rhode Island law applicable and neither party questions that determination on appeal. W.R. Cobb, 2024 WL 1230268, at *3. We therefore primarily follow suit.

---

[7] There is some discrepancy between how Cobb characterizes its appeal in the opening brief's statement of issues and what it actually argued. Where the two diverge, we consider only the arguments developed in the body of Cobb's brief. See Diab v. Ashcroft, 397 F.3d 35, 38 n.1 (1st Cir. 2005) (declining to consider claim that was mentioned only in statement of issues).

Rescission "seeks to create a situation the same as if no contract ever had existed." Dooley v. Stillson, 128 A. 217, 218 (R.I. 1925). Generally, it is treated as a remedy, rather than its own cause of action. Halpert v. Rosenthal, 267 A.2d 730, 735 (R.I. 1970) (referring to "the remedy of rescission"). Case law suggests that Cobb was not necessarily required to explicitly request specific remedies for the causes of action alleged in its complaint. See Town of Portsmouth v. Lewis, 813 F.3d 54, 61 (1st Cir. 2016) ("A plaintiff's failure to seek a remedy in its complaint does not necessarily forgo that remedy."); see also Fed. R. Civ. P. 54(c) ("Every [non-default] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."). Therefore, to the extent rescission is based on causes of action Cobb set forth in the complaint, such as breach of contract and misrepresentation, we do not deem Cobb's request waived simply because the complaint did not expressly seek rescission. On the other hand, ordinarily the "district court need not consider remedies based on a cause of action not pled in the complaint." Lewis, 813 F.3d at 61. As such and as we will explain in detail later, because Cobb's mutual mistake theory was not adequately pled in the complaint (nor did it surface elsewhere at trial), we deem it waived. Having clarified that Rhode Island precedent typically treats rescission

as a remedy, we now turn to our analysis of each cause of action for which Cobb seeks this relief.

**B.    Rescission Based on a Theory of Contract Breach**

We start with Cobb's assertion that the district court should have granted rescission as a remedy for breach of contract. But before we dive into our analysis, we need offer another word about the applicable law.  As mentioned earlier, Rhode Island law seems to govern this dispute.  Yet, Cobb cites only a federal case applying New York law for the proposition that rescission is a remedy for a breach of contract.  Appellant's Br. 12 (quoting Sparkman & Stephens, LLC v. Museum Seaport Museum, Inc., 687 F. Supp. 3d 292, 302 (D.R.I. 2023)).  Under New York law, rescission is an "extraordinary remedy," requiring demonstration of a material and willful breach of contract or, "if not willful, [a breach] so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Sparkman, 687 F. Supp. 3d at 302 (quoting Courchevel 1850 LLC v. Espinosa, No. 17-cv-00799-VB, 2020 WL 635498, at *4 (S.D.N.Y. Feb. 11, 2020), aff'd sub nom. Courchevel 1850 LLC v. Wisdom Equities LLC, 846 F. App'x 33 (2d Cir. 2021)).  Cobb makes no attempt to harmonize this formulation with Rhode Island law.  Our own research indicates that Rhode Island law permits a party to rescind a contract in the face of a counter-party's material breach of contract, and so, despite the shortcomings in Cobb's recitation of

the law, we proceed with an analysis of Cobb's claim on this premise. See Sawyer v. Firestone, 513 A.2d 36, 40 & n.4 (R.I. 1986) (affirming judgment that plaintiff could rescind the contract and obtain return of his deposit where defendant had materially breached by "refus[ing] to perform in accordance with her [contractual] obligations").[8]

To obtain rescission on its breach of contract claim, Cobb must establish that the Letter Agreement imposed a performance obligation on VJ that VJ did not honor. See N. Farm Home Owners Ass'n, Inc. v. Bristol Cnty. Water Auth., 315 A.3d 933, 943 (R.I. 2024) (concluding that defendant did not "breach[] a purported contractual obligation to maintain the master meter system [at plaintiff's facilities] in perpetuity" where there was no evidence that the parties agreed to such a term (emphasis omitted)). Cobb believes that VJ breached the Letter Agreement by not assigning the License to the Joint Entity and the district court erred by ignoring this fact.[9] Cobb's blanket assertions that the court

---

[8] We take no position on whether Rhode Island law imposes any additional prerequisites (e.g., willfulness) to obtaining rescission as a remedy for breach of contract, because as we are about to explain, Cobb has not demonstrated the existence of any breach. Cf. Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 34 (1st Cir. 2020) ("While we are not bound by the parties' collective failure to discuss applicable law, we are generally reluctant to venture beyond the ambit of the parties' arguments to decide an issue without full briefing.").

[9] Cobb argued that VJ breached the Letter Agreement in several other ways in the district court, but does not ask us to revisit

- 13 -

"completely ignored" the "fundamental and material object" of the Letter Agreement (and somehow misread the Letter Agreement as a result) mischaracterizes the district court findings.  And, more importantly, those assertions fail to identify a provision of the Letter Agreement that VJ breached.[10]  Here's why.  As an initial observation and contrary to Cobb's contentions, the district court clearly understood the importance of the License to both parties

the district court's holding as to those alleged breaches on appeal.  See W.R. Cobb, 2024 WL 1230268, at *5-6.  Thus, we limit our review to VJ's failure to assign the License.  See Págan-Lisboa v. Soc. Sec. Admin., 996 F.3d 1, 7 (1st Cir. 2021) (concluding that party waived challenge where lead brief did not "meaningfully contest" agency decision).

[10] Cobb's opening brief devotes significant space to asserting that the district court failed to appreciate assignment of the License as a "foundational requirement" or "fundamental object" of Letter Agreement, which if impossible to meet, frustrated the very purpose of the contract, thereby necessitating rescission.  This may be an effort to show that VJ's failure to assign the License was a breach "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract," under New York law, Sparkman, 687 F. Supp. 3d at 302, such that rescission is the correct remedy.  But that effort, even if made under the correct jurisdiction's law, presupposes the existence of a breach of contract.

Alternatively, Cobb perhaps intends to invoke the frustration of purpose doctrine, but Cobb waives the argument by not citing or applying any legal authority in support of the doctrine.  See Tri-Town Const. Co. v. Com. Park Assocs. 12, LLC, 139 A.3d 467, 475 (R.I. 2016) (describing elements required to establish frustration of purpose); Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011) (deeming claim waived where use of "buzzwords" did not amount to developed argumentation).  Moreover, frustration of purpose is an "affirmative defense" that excuses non-performance, "not a theory of liability in an affirmative cause of action" that Cobb can assert as a basis for relief.  Tri-Town Const., 139 A.3d at 478 (affirming dismissal of counterclaim seeking return of money defendant paid to plaintiff "under what [defendant] believed was the 'frustrated contract'").

and expressly acknowledged that the parties structured the transaction to facilitate assignment of the License to Cobb/VJ. W.R. Cobb, 2024 WL 1230268, at *1 (identifying purpose of ownership structure as securing Forevermark's consent to assignment of License); see id. at 7 (finding that Galili intended to assign License once he obtained Forevermark's approval). Cobb would seemingly have the analysis end here. However, the district court's task was to determine whether Cobb was correct in asserting "[t]he Parties agreed that, *upon execution* of the Agreement, the new entity holding the [License] going forward would be the Joint Venture." To do so, the district court had to figure out what obligations the Letter Agreement actually imposed on VJ relative to the License (specifically when and under what circumstances VJ must assign the License) based not on the parties' "subjective intent," but instead on "the intent expressed by the language of the contract." Botelho v. City of Pawtucket Sch. Dep't, 130 A.3d 172, 176 (R.I. 2016) (quoting JPL Livery Servs., Inc. v. R.I. Dep't of Admin., 88 A.3d 1134, 1142 (R.I. 2014)). The district court -- based on the contractual language and as it understood Cobb's argument -- held that although the License assignment was contemplated, VJ Designs was not required to do so "upon execution" of the Letter Agreement and thus did not breach the agreement by failing to immediately do so. W.R. Cobb, 2024 WL 1230268, at *4.

The viability of Cobb's breach of contract claim thus turns on a question of contract interpretation: did the Letter Agreement require VJ to assign the License to the Joint Entity upon execution?[11] We assess Cobb's arguments for how the district court misinterpreted the Letter Agreement through a de novo lens, keeping in mind that Rhode Island law instructs us to give effect to "the intention of the parties" in interpreting an unambiguous contract,[12] so long as "that intention can be clearly inferred from

---

[11] We limit ourselves to this question because this is the theory of breach Cobb presented to the district court. To the extent Cobb intended to argue in its reply brief that the Letter Agreement provided for transfer of the License at some point after execution of the Letter Agreement and before the transfer of VJ's ownership interest, rather than "immediately," we deem such an argument waived as untimely raised and undeveloped. See Utica Mut. Ins. Co. v. Weathermark Invs., Inc., 292 F.3d 77, 81-82 (1st Cir. 2002); Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg., 295 F.3d 59, 67 (1st Cir. 2002). Cobb also never argued, even in passing, that we should require performance within a reasonable time, much less develop an argument as to the length of a reasonable time for performance under these facts. See, e.g., Durepo v. May, 54 A.2d 15, 18 (R.I. 1947) (recognizing that where the parties have not specified a time for performance "a contract for the sale of land is to be performed within a reasonable time" and that "[w]hat is a reasonable time depends upon the circumstances of each case"); Restatement (Second) of Contracts § 204 (Am. L. Inst. 1981) ("When the parties . . . have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

[12] Although the parties vigorously disagree on the obligations imposed by the Letter Agreement, neither has suggested that its terms are ambiguous. See W.P. Assocs. v. Forcier, Inc., 637 A.2d 353, 357 (R.I. 1994) (rejecting "contention that the parties' conflicting interpretations demonstrate that an ambiguity must exist"); W.R. Cobb, 2024 WL 1230268, at *3 (finding Letter

the writing" and "can be fairly carried out in a manner consistent with settled rules of law." W.P. Assocs., 637 A.2d at 356.

In our view, the strongest point in favor of the district court's ruling is its observation that "there is no provision within the Agreement specifically requiring that the Forevermark license immediately be transferred to the Joint Venture." W.R. Cobb, 2024 WL 1230268, at *4. Our review reveals no express provision requiring VJ to assign the License to the Joint Entity at all, much less that it do so upon execution. Nor do we think that Cobb seriously contests the absence of such a provision, given Lichtenfels' trial testimony that VJ's obligation to transfer the License was memorialized in "a separate document," an assertion the district court deemed "incredible," particularly when no such document was presented at trial. Id. at *2.

In support of Cobb's position, the language of the Letter Agreement that perhaps most clearly contemplates transfer of the License is the requirement that Cobb "pay VJ . . . for the license," among other assets, "[s]imultaneously with the execution of this letter agreement." Put another way, if Cobb promised to pay "for" certain assets under the Agreement, one possible reading

Agreement unambiguous where "neither party directly argues that the Agreement is ambiguous").

- 17 -

of the Letter Agreement is that VJ promised to sell those assets.[13] Cf. Howarth v. Feeney, P.C. No. 86-3543, 1992 WL 813502, at *2 (R.I. Super. Jan. 15, 1992) (concluding that consideration for a valid contract existed where plaintiff promised to buy and defendant promised to sell property), amended, C.A. No. 80-265, 1992 WL 813534 (R.I. Super. Mar. 17, 1992). However, even if we read the payment provision in this manner, the Letter Agreement says nothing about when VJ should transfer its assets, this, in spite of the fact that the parties clearly understood how to draft a contract to require performance at a specific time. For example, as per the parties' contract, Cobb's $125,000 payment for the assets and $150,000 advance for VJ's inventory was due to be paid "[s]imultaneously with the execution of this letter agreement." See Andrade v. The Neurology Found., Inc., No. PC-2018-7699, 2019 WL 4600499, at *5 (R.I. Super. Sep. 17, 2019) ("Similar to the rules of statutory construction, when a contract includes specific language in one section but excludes it in another section, it can

---

[13] We do not hold that this is the only possible reading of the payment provision. The context of the clause in the larger agreement suggests that this was not a simple purchase and sale of the listed assets. For instance, the parties agreed that the payment would be "nonrefundable," suggesting that Cobb agreed to bear some risk in the event that not all the assets could be transferred as the parties hoped. This risk materialized not only with respect to the License, the assignment of which the parties knew depended upon Forevermark's consent, but also with respect to VJ's office lease and the CADs, the transfers of which were complicated by the rights of third parties. W.R. Cobb, 2024 WL 1230268, at *3, 5-6.

- 18 -

be presumed that the drafter acted intentionally in deciding to include or exclude such language." (citing In re Proposed Town of New Shoreham Project, 25 A.3d 482, 525 (R.I. 2011))). And the parties had good reason not to impose a deadline for any contemplated transfer of the License, given that they both understood that -- under the terms of the License between VJ and Forevermark -- an effective assignment of the License required Forevermark's written consent. See In re 25 Burnside Ave., Narragansett, R.I., 204 A.3d 612, 620 (R.I. 2019) (explaining that "the intention of the parties must govern [an unambiguous contract] *if* that intention can be clearly inferred from the writing and *if it can be fairly carried out in a manner consistent with settled rules of law*" (second emphasis added) (quoting W.P. Assocs., 637 A.2d at 356)).

In the absence of express language requiring VJ to assign the License upon execution, Cobb points to two provisions of the Letter Agreement which it believes nonetheless support its position. The first states that "Cobb/VJ shall operate a Forevermark business under the Forevermark License with other assets related to the Forevermark business." As best we can tell, Cobb's argument appears to be that the assignment needed to occur immediately, because unless Cobb/VJ was the licensee, it "could not practically or legally operate." As counsel put it during oral argument, "if there was no transfer of the License, the Joint

- 19 -

Venture could make no sales." This argument is based on the premise that only the party holding the License can exercise rights granted by the License and "make sales" of Forevermark products. If we accept Cobb's premise at face value, we would have difficulty making sense of provisions indicating that VJ Designs could continue to "sell down" its existing Forevermark inventory. See Wholey v. Columbian Nat. Life Ins. Co., 32 A.2d 791, 795 (R.I. 1943) ("It is fundamental that a contract should be so construed as to give a lawful and effective meaning to the intention of the parties as gathered from the attending circumstances."). That is so because once VJ no longer held the License, it seemingly would have no licensing right to sell off its Forevermark inventory. Cobb offers no response to this apparent contradiction, even though the district court cited these same "sell down" provisions in rejecting Cobb's breach of contract claim. W.R. Cobb, 2024 WL 1230268, at *4. Thus, we do not read the Letter Agreement's statement that Cobb/VJ will "operate under the Forevermark License" to say anything about VJ's obligation to assign the License.[14]

---

[14] In rejecting Cobb's argument, we do not necessarily endorse Appellees' view (which we'll describe in a moment) of what the Joint Entity was permitted to do absent an assignment of the License. Our opinion today answers only the question of whether the Letter Agreement imposed an obligation on VJ to assign the License upon execution. We address Cobb's assertion about the

- 20 -

Next, Cobb points to a provision of the Letter Agreement specifying that "[i]t won't be necessary for VJ, [Cobb], Wenham, (a related Cobb company) or WR Cobb/VJ, LLC to sign additional papers to put into place and carry out the various agreements described in this letter." Cobb asserts that this provision reflected the parties' belief "that everything was properly in place" as of "the signing of the Letter Agreement." But we struggle to understand how this provision supports Cobb's position. Its argument appears to be that the parties expected an immediate assignment of the License because all requisites, including Forevermark's consent, had been met, and that no further documents needed to be signed for VJ to carry out the assignment. We disagree. First, this provision seems to have no specific relationship to the assignment of the License, because it refers generally to "various agreements described in this letter." And

_____

Joint Entity's ability to operate only to show the flaws in its reading of the Letter Agreement.

To clarify our understanding of Appellees' view, they seem to agree with Cobb that generally only the holder of the License could "make sales" of Forevermark products. But Appellees posit that an exception existed for Cobb/VJ so long as VJ Designs remained the majority owner of Cobb/VJ. We take no position on whether Appellees are ultimately correct in this assessment. The answer to that question seems to depend on the scope of Forevermark's rights in its brand and products, the terms of the License itself, the relationship between a parent and a majority-owned subsidiary, and perhaps some agreement by Forevermark to waive or modify its contractual rights. Appellees' support for their position consists of Galili's testimony during the bench trial, which alluded to some agreement between VJ and Forevermark.

as we just explained, the Letter Agreement contains no express provision obligating an assignment of the License, especially not one requiring simultaneous transfer with execution. Rather, in the context of the Letter Agreement in toto, it seems most likely that the provision was intended to refer to VJ's transfer of its percentage ownership interest to the Joint Entity, an arrangement expressly "described" in the Letter Agreement, for which VJ had already executed an undated assignment such that no "additional papers" would have been necessary to effect transfer.

Moreover, we do not understand, as Cobb asserts, how the disclaimer that VJ, Cobb, and the Joint Entity need not "sign additional papers" reflects an understanding that Forevermark had already consented to assignment of the License. The cited provision seems to have no bearing on Forevermark's consent to an assignment, since such consent would most certainly have required Forevermark's written approval, but not necessarily any additional signatures from VJ, Cobb, or the Joint Entity. We note also that the district court specifically discredited Lichtenfels' testimony that a separate document from Forevermark had already "grant[ed] written permission to VJ Designs to transfer its license to the Joint [Entity]" and that a Cobb employee "met with Forevermark representatives who told him that Forevermark would allow the transfer of VJ Designs' Forevermark license to the Joint Venture if VJ Designs owned a majority interest in the Joint Venture."

Id. at *2. These adverse credibility decisions, which we have no reason to second-guess, undercut any basis for Cobb's asserted belief that Forevermark's consent had been secured.[15] See Calderón-Ortega, 753 F.3d at 252, 253 n.1 (explaining that "an appellate court will displace factual findings made in the aftermath of a bench trial [only] if those findings are clearly erroneous" and deferring to the district court's determination that plaintiff's testimony was not credible (alteration in original) (quoting 15 Bosworth St., 236 F.3d at 53)).

Finally and of particular note, we observe that the idea of an immediate assignment is inconsistent with the provision of the Letter Agreement which provided that VJ would transfer its ownership interest in the Joint Entity to Cobb once Forevermark "becomes comfortable" with Cobb. Although the "becomes-comfortable" provision deals with the transfer of VJ's ownership interest in Cobb/VJ (rather than a transfer of the License), in

---

[15] Cobb asserts that its belief was bolstered by a May 18, 2018 email from Galili to Forevermark representatives expressing "appreciation" for Forevermark's "approval of the possible joint venture." But Cobb does not articulate any challenge to factual findings by the district court that cast doubt on that assertion. For instance, the district court found that Lichtenfels participated in drafting the May 18, 2018 email to Forevermark and Forevermark never responded to that email, despite Lichtenfels' testimony to the contrary. W.R. Cobb, 2024 WL 1230268, at *2. From these findings, we infer that Cobb knew Forevermark's consent had not yet been obtained and drafted the May 18, 2018 email for Galili to send in the hopes of prompting definitive approval from Forevermark. See Smith, 76 F.3d at 420 (recognizing deference given to inferences drawn from district court's factual findings).

our view, the provision demonstrates the parties' awareness that Forevermark would not necessarily have been comfortable with Cobb's control over the License upon execution of the Letter Agreement. The terminology suggests Forevermark must have wanted, for some duration, to observe Cobb's business dealings and perhaps develop a trustworthy relationship with it. Such an interpretation makes sense, especially when the genesis of this collaboration was rooted in Forevermark's unwillingness to grant to Cobb individually, one of its prize licenses. Put differently, it is inconceivable that the parties would have expected Forevermark (clearly a cautious licensor) to consent to a transfer of the License upon execution of the Letter Agreement to an entity controlled by Cobb[16] when the parties themselves recognized the need to satisfy Forevermark's undefined comfort level before Cobb could even assume complete ownership of the Joint Entity.

Because Cobb has offered no persuasive reasoning that VJ breached the Letter Agreement by not assigning the License to the Joint Entity upon execution of the Letter Agreement, we follow the lead of Rhode Island courts in declining "to read nonexistent terms or limitations into [the Letter Agreement]." Pearson v. Pearson,

---

[16] As Lichtenfels testified at the bench trial and as we noted above, VJ's so-called majority interest in Cobb/VJ was "nominal" or "on paper" only, and would have offered little "comfort" to Forevermark. The Letter Agreement granted Cobb "all voting rights and ownership rights . . . for VJ's 51%" and thus allowed Cobb complete control from the outset.

11 A.3d 103, 109 (R.I. 2011) (declining to require party to prevail on underlying motion in order to obtain attorney's fees where parties' settlement agreement contained no such requirement); see Serenska v. Wells Fargo Bank, N.A., 307 A.3d 1275, 1282 (R.I. 2024) (declining to require that plaintiff be notified of deadline for reinstatement where mortgage did not require such notification and explaining "[i]t is not the role of this Court to add a requirement that is absent from the document at issue"). Left only with Cobb's sweeping assertions that the district court got the breach of contract issue wrong, we see no basis to disturb the district court's holding, nor any reason to grant a rescission remedy for such a claim.

C.    **Rescission Based on a Theory of Fraud or Misrepresentation**

Cobb asserts that the district court erred by not considering rescission as a remedy for VJ Designs' and Galili's fraud (specifically, fraud in the inducement) and misrepresentation claims -- claims which Appellees deny and say need no remedying. But our ability to engage meaningfully with these claims is hampered by Cobb's failure to "spell out [its] issues clearly, highlighting the relevant facts and analyzing on-point authority." Rodríguez, 659 F.3d at 175.

As best we can tell, Cobb faults the district court for "not address[ing] the contradictory conduct and representations of Benjamin Galili" with respect to "[t]he failure of Forevermark to

consent to the transfer or assignment of the License." But Cobb does not identify what acts or statements by Galili comprised the ignored misrepresentation, explain how that misrepresentation was material, establish Cobb's reliance on that misrepresentation, or demonstrate that Galili had the requisite intent and knowledge. See McNulty v. Chip, 116 A.3d 173, 182-83 (R.I. 2015) (explaining elements of fraud). In a similar fashion, Cobb's brief speaks of "another misrepresentation by Mr. Galili" in relation to the CAD files, but Cobb never explains how the district court erred in its analysis of that representation. In short, Cobb's brief boils down to merely (1) a recitation that rescission is a remedy for fraudulent inducement[17] and (2) vague claims that the district court "ignored" or failed to "address" unspecified misrepresentations.[18] Because Cobb did not develop an argument

---

[17] It is unclear whether Cobb's opening brief even challenges the district court's ruling as to negligent misrepresentation, given its focus on "fraud" (i.e., intentional misrepresentation). In any event, if Cobb intended to also argue that negligent misrepresentation was proven at trial, its development of that argument is lacking for the same reasons as its arguments regarding fraud.

[18] We note Cobb's generic accusation that the district court "ignored the misrepresentations" is plainly contradicted by the district court's written opinion. In fact, the district court expressly addressed alleged misrepresentations, intentional and negligent, regarding assignment of the License and transfer of the CAD files and explained why Cobb had not proven its case. W.R. Cobb, 2024 WL 1230268, at *7-8. Cobb fails to develop an argument as to why the district court erred in ruling in VJ's favor. See, e.g., Págan-Lisboa, 996 F.3d at 7; United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

that applied the facts of this case to the elements of a misrepresentation claim, Cobb has waived the issue for lack of development. See Town of Norwood v. FERC, 202 F.3d 392, 405 (1st Cir. 2000) ("[D]eveloping a sustained argument out of [the record] and legal precedents is the job of the appellant, not the reviewing court, as we have previously warned.").

Thus, we affirm the district court's ruling that no misrepresentation occurred and conclude that the district court appropriately did not rescind the Letter Agreement on this basis. Further, as Cobb did not prove that either Galili or VJ misrepresented a material fact, Galili could not be held personally liable for any such conduct.

## D. Rescission Based on a Theory of Mutual Mistake

Cobb's final attack on the ruling below faults the district court for not addressing Cobb's mutual mistake "theory for relief" and not rescinding the Letter Agreement on that basis. As Appellees point out and as we alluded to earlier in this opinion, this "theory for relief" was not pled in Cobb's complaint and was first raised in Cobb's post-trial proposed findings of fact and conclusions of law. Cobb's only reply to this point is that "rescission" is a remedy and not a cause of action. Rescission of a contract may be a remedy, but parties typically plead a separate cause of action in the complaint when seeking that remedy on the basis of mutual mistake. See, e.g., IDC Props.,

Inc. v. Goat Island S. Condo. Ass'n, Inc., 128 A.3d 383, 387 (R.I. 2015) (stating that plaintiffs moved to amend complaint to "add a claim to rescind the [contract] due to mutual mistake"); Medeiros v. Bankers Tr. Co., 38 A.3d 1112, 1115 n.8 (R.I. 2012) (noting that complaint stated a count for mutual mistake).

A complaint must give the defendant fair notice of the claim asserted and the grounds upon which it rests. Calvi v. Knox Cnty., 470 F.3d 422, 430-31 (1st Cir. 2006). When, late in the litigation, a plaintiff attempts to assert a claim it declined to include in the pleadings, that unpled claim will generally be deemed waived. See id. (affirming determination that plaintiff could not raise claim for first time on summary judgment). Though Cobb's complaint did allege that Appellees knew that they would not be able to fulfill their contractual obligations and that they intended to deceive Cobb into entering the Letter Agreement, it said nothing about the parties being mutually mistaken in their belief regarding whether a material fact underlying the contract would thwart performance. We might adopt a more lenient position towards Cobb, in deference to our liberal pleading standard, if it had simply failed to "identify by name" its mutual mistake theory but had nevertheless alleged that the contract contained errors and stated facts sufficiently implicating such a mutual mistake theory. See Berezin v. Regency Sav. Bank, 234 F.3d 68, 71 (1st Cir. 2000) (reversing grant of motion to dismiss where district

court "overlook[ed]" the plaintiff's theory of mutual mistake even though the complaint affirmatively alleged that the parties' agreement contained at least three mistakes of which the parties were unaware at the time they entered the agreement). That is simply not the case here. As a result, Appellees lacked notice that Cobb would pursue a mutual mistake theory. See Calvi, 470 F.3d at 430-31 (concluding that plaintiff waived unpled false arrest claim because allegations that defendant physically abused plaintiff did not put defendant on notice of a false arrest claim); Torres-Rios v. LPS Lab'ys, Inc., 152 F.3d 11, 16 (1st Cir. 1998) (rejecting argument that an alleged defect based on inadequate warnings "implicitly" included a design defect claim and deeming the design defect claim waived); see also Dubreuil v. Allstate Ins. Co., 511 A.2d 300, 302-03 (R.I. 1986) (concluding plaintiff was not entitled to reformation of insurance policy where "allegations in the complaint do not set forth a mutual mistake," but rather that insurer had breached a purported duty of care).

Aside from not pleading mutual mistake, we see no indication that Cobb ever otherwise advanced such a claim in the district court at any time prior to or during the trial itself. Instead, as earlier noted, it waited until its post-trial submission to assert this "theory for relief," leaving Appellees with no opportunity to conduct relevant discovery, elicit helpful

trial testimony, or respond.[19]  See Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 76 (1st Cir. 2016) ("Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled."). Under such circumstances, Cobb waived any claim of mutual mistake and the district court was not required to address it in its post-trial decision. See Cinelli v. Petrella, 78 F.3d 577, 1996 WL 68239, at *1 (1st Cir. 1996) (unpublished table opinion) (affirming post-bench trial judgment which did not consider equal protection claim that was not alleged in complaint or mentioned in pretrial memorandum).

Even if we looked past Cobb's procedural missteps (which we do not), its mutual mistake theory fails on the merits. Cobb seeks rescission based on a "disconnect" between the parties, rather than a "shared misconception relating to the parties' intent." Merrimack Mut. Fire Ins. Co. v. Dufault, 958 A.2d 620,

---

[19] Cobb may have attempted to argue in a footnote to its post-trial brief that any causes of action which were unpled were tried by implied consent under Federal Rule of Civil Procedure 15(b)(2). If so, Cobb did not develop this argument before the district court, as it did not even allude to our framework for assessing implied consent under Rule 15(b). See Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300, 309 (1st Cir. 2022). Nor does Cobb advance this argument on appeal. Thus, the argument is doubly waived. See Mirabella v. Town of Lexington, 64 F.4th 55, 56 (1st Cir. 2023) (holding that issue which was not advanced in district court or developed in appellate briefs was doubly waived).

624 (R.I. 2008) (quoting McEntee v. Davis, 861 A.2d 459, 463 (R.I. 2004)). Cobb states that "Galili's intent was for the Joint Venture to operate under VJ Designs' License, not for the Joint Venture to hold the License itself and make sales." On the other hand, Cobb had a different expectation: "W.R. Cobb intended that, as of May 30, 2018, the Joint Venture was to operate under the License that would be transferred to the Joint Venture and held in the Joint Venture's name." There is no mutual mistake where, in Cobb's own telling of the story, the parties intended or expected different outcomes. If Cobb made "a unilateral mistake by not memorializing the terms of the agreement as [it] understood them" or wished them to be, we can provide no remedy. Rivera v. Gagnon, 847 A.2d 280, 285 (R.I. 2004); see Merrimack Mut., 958 A.2d at 626 (concluding that insurance company could not "retreat from" plain language of policy based on unilateral mistake by insured).

In short, the district court had no obligation to address Cobb's unpled and untimely-raised mutual mistake claim, and even if it had, Cobb's theory of mistake fails on the merits. Accordingly, we affirm.

## CONCLUSION

Having carefully considered each of Cobb's claims, we conclude that the district court appropriately declined to rescind the Letter Agreement and to hold Galili personally liable for misrepresentation. Thus, we affirm the district court's judgment.

Cost to Appellees.